UNITED STATES of America, Appellee,

v.

James PEDROZA, Francisco C. Pelaes, Jose Perez, and Enrique Jesus Osorno, Defendants-Appellants.

Nos. 136, 139, 141, 142, Dockets 84–1160 to 84–1163.

United States Court of Appeals, Second Circuit.

Argued Sept. 17, 1984.

Decided Dec. 11, 1984.

Alan R. Kaufman, New York City, for defendant-appellant James Pedroza.

B. Alan Seidler, Tappan, N.Y., submitted a brief for defendant-appellant Francisco C. Pelaes.

Lawrence J. Gross, Elmhurst, N.Y., for defendant-appellant Jose Perez.

Lawrence S. Kerben, New York City, for defendant-appellant Enrique Jesus Osorno.

Before OAKES, KEARSE and PRATT, Circuit Judges.

KEARSE, Circuit Judge:

Defendants James Pedroza, Francisco C. Pelaes, Jose Perez, and Enrique Jesus Osorno appeal from judgments entered in the United States District Court for the Southern District of New York, after a jury trial before Lee P. Gagliardi, *Judge*, convicting them on one count of kidnaping Luis Almeida ("Luis") and transporting him in interstate commerce, in violation of 18 U.S.C. § 1201(a)(1) (1982), and one count of conspiring to commit those acts, in violation of 18 U.S.C. § 1201(c) (1982). On appeal, defendants contend, *inter alia*, that the trial court erred in refusing to allow them to cross-examine government witnesses as to whether Luis's father, Carlos Almeida ("Carlos" or "Almeida"), had voluntarily given them custody of Luis. Finding merit in this contention, we vacate the judgments of conviction and remand to the district court for a new trial.

## I. BACKGROUND

On November 25, 1983, Perez, Pelaes, and two others intercepted 11-year-old Luis as he left his house in Los Angeles, California, and, at gunpoint, caused him to enter their van. They took him, blindfolded, to a recently rented house where he was kept for about two weeks, and then they took him to New York. On December 16, 1983, in New York, Luis was recaptured by agents of the Federal Bureau of Investigation ("FBI"). The government's theory was that the kidnaping was narcotics-related, *i.e.*, that the defendants and others[1]

Edna Wells Handy, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Barry A. Bohrer, Asst. U.S. Atty., New York City, on brief), for appellee.

1. The indictment charging these appellants also charged four other individuals, Carmen Gloria

had kidnaped Luis as part of an effort to recover seven kilograms of cocaine that had been entrusted to Jose Alfredo Almeida ("Freddy"), who was Carlos's brother and Luis's uncle, and to Freddy's father-in-law, Victor Jimenez.

## A. *The Proof of Kidnaping*

The government sought to prove its theory principally through the testimony of Luis, his father, and his stepmother as to the taking of Luis and the ensuing events; the testimony of Freddy, his wife, and police officers as to the antecedent narcotics transactions; tape recordings of calls to the Almeidas by certain of the defendants following the taking of Luis; and the testimony of law enforcement officers who participated in the investigation.

### 1. *The Cocaine Connection*

Early in 1983, Freddy was introduced to Ramon Antonio Serrano, a/k/a "Gilberto," who thereafter hired Freddy and two others to transport cocaine, apparently supplied to him by Osorno on consignment, from Miami, Florida, to Los Angeles. Some weeks after Freddy and his fellow drivers delivered the cocaine to Serrano in Los Angeles, Serrano asked Freddy to recommend a trustworthy person to hold the cocaine, which at that point amounted to seven kilograms. Freddy suggested his father-in-law, Victor Jimenez, who agreed. Freddy and Serrano hid the cocaine in Jimenez's house.

In June 1983, Freddy was arrested on narcotics charges. While in jail, he sent word to Serrano to remove the cocaine from Jimenez's house. Before Serrano could do so, however, the cocaine apparently was taken to the home of Jimenez's daughter, Diane. Thereafter, local police arrested a person who informed them of the narcotics at Diane's home, and the police promptly seized the seven kilograms of cocaine.

Serrano, however, according to Freddy's testimony, did not believe that the cocaine had been seized by the police, believing instead that it had been stolen by Jimenez, who by this time had disappeared. In an effort to locate Jimenez and the cocaine, Serrano threatened Freddy and his family. Serrano told Freddy that he "had a beautiful wife and two nice kids" and that if Freddy didn't "want somebody to get hurt" he had "better ... tell the truth ... [about] what happened with the cocaine." Serrano told Freddy's wife that "he could take one of [her] kids" if she didn't tell him where Victor Jimenez had gone, and that "if something ... happen[ed] to [her] mother it wouldn't be [Serrano's] fault."

At the same time, Osorno was looking for Serrano to inquire what had become of the cocaine.

### 2. *The Seizure of Luis*

In November 1983, Serrano went to Miami to recruit men to help him recover the cocaine. He returned to Los Angeles with Perez and Angel Lastre-Parrada; Pelaes and Pedroza followed shortly. On November 15, Serrano and his girlfriend Carmen Gloria Hernandez, accompanied by Pedroza and Pelaes, purchased a black 1977 Chevrolet van; on November 19, Serrano and Hernandez rented a house at 2000 Fulton Street, Monterey Park, California; on or about November 21, Serrano and Lastre-Parrada reconnoitered the area around Luis's house, particularly the adjacent parking lot, where they were seen by Luis.

In the early morning of November 25, 1983, Perez, Pelaes, Lastre-Parrada, and Antonio Martines drove the van to the Almeida residence. At approximately 5:45

---

Hernandez, Ramon Antonio Serrano, a/k/a "Gilberto," Angel Lastre-Parrada, and Antonio Martines, with the same offenses. Hernandez pleaded guilty before trial to a superseding information charging her with conspiracy to possess and distribute seven kilograms of cocaine, in violation of 21 U.S.C. § 846 (1982), and with interstate communication of a ransom demand,

in violation of 18 U.S.C. § 875 (1982). Serrano and Lastre-Parrada were fugitives at the time of trial, though they have since been apprehended. Martines was subjected to a psychiatric examination which led to the conclusion that he was neither mentally competent to stand trial nor responsible for his criminal acts.

a.m., when Luis emerged from the house carrying a bag of trash and a bundle of baby clothes, the occupants of the van grabbed Luis. Pelaes pointed a gun at him, and Perez told him that if he yelled, Perez would tape his mouth. The men put Luis in the van and drove him to the Fulton Street house. Luis was unable to observe their route because the van's windows were taped. When they arrived, Luis was blindfolded and taken into the house, where he and his captors were met by Serrano and Hernandez. Pedroza arrived shortly thereafter, as did a woman named Gloria ("Gloria").

### 3. The Early Post-Seizure Communications

Shortly after Luis was abducted, his stepmother, Guadalupe Almeida ("Lupe"), noticed his absence. At about 8:15 a.m., after a search of the neighborhood and several telephone calls had failed to locate Luis, Lupe filed a missing persons report with the local police. During the day, Carlos received three telephone calls from an unidentified caller who told Carlos that Luis had been kidnaped and demanded the seven kilograms of cocaine as ransom. Carlos and Lupe made a series of telephone calls in an attempt to find Luis. Eventually, Carlos received a call from Osorno who stated that he would attempt to help. Three days later, when no progress had been made, Carlos and Lupe told the police of the cocaine transaction, the ransom demands, and their unsuccessful efforts to secure Luis's return. The police called in the FBI.

With the consent of Carlos and Lupe, the FBI installed a recording device on the Almeidas' telephone on November 29. Beginning on December 2, law enforcement officers were on around-the-clock duty in the Almeidas' home. Between November 29 and December 16, the Almeidas and the FBI recorded a number of telephone conversations relating to Luis's abduction, fifteen of which were introduced by the government at trial. These included four calls from Lastre-Parrada on November 29

and December 1, 3, and 4, demanding seven "aparatos," a word used to denote kilograms of cocaine, in return for Luis. Lastre-Parrada refused to believe Carlos's claim that he did not have access to such a quantity of cocaine and that Serrano's cocaine had been seized by the police. On December 8, 1983, Osorno called Carlos and, adopting the role of go-between, expressed surprise that Luis had still not been returned. Stating that he did not know how to contact those who held Luis, Osorno promised that he would nonetheless attempt to do so.

### 4. Luis Is Taken to New York and Is Recaptured

Luis was kept at the Fulton Street house for about two weeks, with Serrano, Hernandez, Gloria, Pelaes, Perez, Lastre-Parrada, Martines, and Pedroza in constant attendance. Hernandez warned Luis that if he looked out the windows, men would come after him with guns. She told Luis that Carlos was to "go get some money for them" and that, though Carlos "wasn't involved," Jimenez had the money, and Luis had been taken so that Carlos would get the money for them. After two weeks, Pelaes, Serrano, Hernandez, Gloria, and Martines drove Luis from Los Angeles to New York in the van.

On December 13, Osorno called Carlos and told him to go to Newark, New Jersey, with seven kilograms of cocaine which Luis's captors would accept in exchange for the boy. He and Pelaes called again on the following day to make arrangements for Carlos's trip to Newark. During this conversation Carlos demanded to speak to Luis to determine that Pelaes and Osorno did indeed have Luis and that he was unharmed. Pelaes and Osorno resisted but eventually agreed, and, later that day, Pelaes called again and put Luis on the phone. After allowing Carlos to speak with Luis briefly, Pelaes told Carlos that the ransom demand was increased to include money and jewelry in addition to the seven kilograms of cocaine, stating that if Carlos did not deliver these items he would

not see Luis alive again. Pelaes called Carlos twice on December 15 to make final arrangements for Carlos's trip and the exchange of Luis for the ransom.

On December 16, 1983, Carlos, accompanied by an FBI agent and an official from the Drug Enforcement Administration ("DEA"), flew to Newark carrying seven kilograms of cocaine (supplied by the DEA) to be exchanged for Luis. Upon his arrival, Carlos called a number that Pelaes had given him. Osorno returned the call and told Carlos to go to a hotel in New York and await another telephone call. That evening, Carlos again called the number provided by Pelaes and received a return call from Osorno. Carlos asked to speak with Luis; Osorno responded that Luis was not with him but that Carlos could speak with Luis later when they made the final arrangements for the exchange.

Meanwhile, on December 15 and 16, FBI agents had been keeping many of the alleged conspirators under surveillance. Some time after 8:00 p.m. on December 16, several agents followed a car carrying Osorno, Pedroza, Hernandez, and Luis to a street corner telephone booth. When Carlos received a call from Osorno and was allowed to speak to Luis, the agents were able to recapture Luis and arrest the other three. Other agents promptly arrested Perez, Pelaes, and Martines, who were under surveillance in the van several blocks away. Agents who had been following Serrano in another car lost him, and he was a fugitive at the time of trial.

### B. *The Defense Version*

Defendants' primary defense was that they lacked the intent necessary to be guilty of kidnaping because they had been led by Serrano to believe that Carlos had voluntarily given Luis to them as "security" for payment of a debt or for return of the missing cocaine. As discussed in greater detail in Part II, below, defendants commenced their efforts to establish their view of the events during their cross-examination of the government's witnesses. Among other things, they brought out

through cross-examination of Luis that during the trip to New York and after their arrival in New York, Luis had not been treated like a captive nor acted like one. However, other attempts to elicit less circumstantial evidence to substantiate the theory of Carlos's consent through cross-examination of Carlos, Lupe, and Luis were forestalled when the court refused to allow defendants to pose such questions.

Only Perez and Pelaes testified on their own behalf. Perez testified that he went to Los Angeles in November 1983 because Serrano offered him $3,000 to help "collect a debt" from Carlos. Serrano told Perez that Carlos was going to give Luis to Serrano for two or three days as a good faith gesture that the money would be paid. According to Serrano, Carlos had arranged that Luis would be in the parking lot early on the morning of November 25 to be picked up; this subterfuge was required because Carlos had not told Lupe of the proposed "security" transaction. Perez stated that he therefore did not understand their pick-up of Luis to have been a kidnaping but rather thought it was a business arrangement between Carlos and Serrano.

Pelaes testified to much the same effect as had Perez. He had flown from Miami to Los Angeles with Pedroza, having been offered $1,500 to help Serrano collect a debt. Pelaes admitted making telephone calls to Carlos from New York after arriving there with Luis but testified that his calls and their contents were at Serrano's instructions.

### C. *The Issues on this Appeal*

The jury found all four defendants guilty on both counts of the indictment. Pelaes, Perez, and Osorno were sentenced to terms of life imprisonment on each count. Pedroza was sentenced to concurrent prison terms of twenty years on each count.

Defendants' most compelling contention on appeal is that the trial court committed reversible error in refusing to allow them to cross-examine Carlos, Lupe, and Luis to bring out facts to substantiate their contention that they believed the abduction of

Luis was with Carlos's consent. Although we reject most of their other contentions, we agree that cross-examination was unduly curtailed and that defendants are therefore entitled to a new trial.

## II. CURTAILMENT OF CROSS-EXAMINATION ON THE DEFENSE VERSION

Defendants' contention was that they were not guilty of kidnaping for either or both of two reasons. First, they contended that Carlos had voluntarily given Serrano custody of Luis, and hence the abduction was not a kidnaping. Second, they maintained that Serrano told them that Carlos had given him custody of Luis, and hence they did not have the intent to kidnap. In order to support the latter contention, they testified to what Serrano had told them; in order to support both their testimony as to what Serrano had told them and their theory that the abduction was in fact with Carlos's consent and was thus not a kidnaping, they attempted to bring out that Carlos had in fact entered into a voluntary custodial arrangement with Serrano.

Defendants' theory that Carlos had voluntarily given them custody of Luis was first mentioned on the record during the first day of trial. The Assistant United States Attorney who tried the case for the government adverted to it as follows: "The only thing that's probative of the kidnapping itself is whether the family gave the child—and that's the only way that a kidnapping would be vitiated." Shortly thereafter, counsel for Perez stated that "our defense is there was no kidnapping, that the boy was handed over by Carlos Almeida as a gesture of his good faith." The fact that there was a dispute as to whether defendants' acts constituted kidnaping was recognized by the court. When the government's law enforcement witnesses testified in terms of their investigation of a "kidnapping," defense objections were sustained; the court instructed the jury that "whether

or not it was a kidnapping is a question of fact you have to determine."

Thereafter, during the cross-examination of the government witnesses, defendants brought out a number of statements and circumstances in an attempt to give substance to their contentions. For example, in a taped telephone conversation on December 15, Carlos was recorded as stating, "I love my son but I love myself more." [2] Further, cross-examination of an FBI agent who stayed at the Almeidas' house elicited testimony that when the agent arrived on December 3 he noticed a puzzling lack of excitement or emotion on the part of Carlos. The agent suspected that Carlos was not being entirely truthful with the law enforcement officers.

In their cross-examination of Luis, defendants sought to bring out that Luis had neither been treated like nor acted like a captive. For example, on the drive east Luis was the only member of the group who spoke English; yet one or more of his abductors freely brought him into commercial establishments, and in restaurants he frequently ordered for them. Despite the opportunities presented by these situations, Luis made no effort to tell anyone that he was being held captive. Luis testified in a pretrial deposition that he had not thought of running away. At trial he testified that he had made no such attempt because he was afraid for his family and for Carlos.

In New York, Luis was taken to the apartment of Gloria's mother, "Tedura," where he stayed with Tedura and her two children. Luis was kept there for about one week, during which time Serrano, Hernandez, Pelaes, and Martines visited, but did not stay at, the apartment. On one occasion Hernandez took Luis and Tedura's 10-year-old daughter shopping to buy a present for Tedura. Luis made no effort to escape.

During the three weeks of Luis's absence, Carlos and Lupe did not inform

2. Carlos at first denied that he had made such a statement and later sought to explain the statement by saying that he had been instructed by the FBI agents to prolong the telephone call, and he was merely making conversation. This explanation was, of course, a matter for the jury to accept or reject, as it chose, on the basis of a complete record.

Luis's mother, who lived in Mexico, that he had been kidnaped. When Luis was returned home and telephoned his mother, he did not mention a kidnaping. He told her he had been on a vacation.

Interspersed among these bits of circumstantial evidence, defendants sought to ask witnesses direct questions as to Carlos's consent to the taking of Luis. They first asked Lupe if Carlos had not admitted to her that "he had given [Luis] to some men." The government objected, contending that such a question could not be asked absent a showing of a good faith basis for it. The court sustained the objection and cut off counsel's apparent attempt to state that he thought the defendants had a good faith basis.[3] When Carlos testified, the government asked him on direct examination, "Mr. Almeida, could you tell us, did you have any involvement in your son's disappearance?" Carlos answered, "No." Defendants then sought to cross-examine on this point, asking Carlos, "Isn't it true you said, 'Freddy's in jail, I will get the seven kilograms, here's my son. You hold him as proof of my good faith'?" The court sustained the government's objection that a good faith basis for such a question was required and had not been provided, and sharply cut off discussion when counsel sought to point out that the government had asked Carlos the converse question. Finally, during the cross-examination of Luis, defendants sought to ask whether Carlos had told Luis that he needed Luis to help him by going with some people. Their question was disallowed upon the government's good-faith-basis objection.[4]

In the recess following the disallowed questions to Luis, counsel for Perez informed the court that his client had told him that Perez's understanding was that Carlos had agreed to give them custody of Luis. Eventually, both Perez and Pelaes were allowed to testify that Serrano had told them that Carlos had entered into this arrangement, and that they therefore had no understanding that the taking of Luis was a kidnaping. Some evidence to substantiate that portion of the defense theory which contended that defendants had no intent to kidnap was therefore before the jury. Defendants argue, however, that the court's curtailment of their cross-examination of Carlos, Lupe, and Luis as to Carlos's consent improperly prevented them both from further supporting this contention and from suggesting that there was no kidnaping because of Carlos's consent. We agree.

▬ It is well established that the scope and extent of cross-examination are generally within the sound discretion of the trial court. *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931); *United States v. Cambindo-Valencia,* 609 F.2d 603, 630 (2d Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 163, 64 L.Ed.2d 795 (1980); *United States v. Green,* 523 F.2d 229, 237 (2d Cir.1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed. 84 (1976); *United States v. Kahn,* 472 F.2d 272, 281 (2d Cir.), *cert. denied,* 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973). Wide latitude should be allowed, however, when a government witness in a criminal case is being cross-examined by the defendant, *United States v. Masino,*

---

**3.** Q [MR. GROSS]: What did Carlos say?
A: I told him Luis wasn't home, I couldn't find him.
Q: What did Carlos say?
A: He might have been with his friends or jogging in the park.
Q: Didn't eventually Carlos admit that he had given Carlos [*sic*] over to some men?
MS. HANDY: Objection.
THE COURT: Sustained.
MR. GROSS: Let me finish the question.
MS. HANDY: I would like a good faith basis for that question.
THE COURT: Sustained.
MR. GROSS: I think we have a—

THE COURT: Sustained.
MR. GROSS: I think we have a—
THE COURT: Sustained.
MR. GROSS: I have no further questions. (Tr. 310–11).

**4.** At oral argument of this appeal, the government asserted that its objections had been to the form, rather than the substance, of the defense questions. While such an objection to at least some of these questions would perhaps have been well taken, this interpretation of the objections is not supported by the record.

275 F.2d 129, 132 (2d Cir.1960), and the trial judge's discretion "cannot be expanded to justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony," *Gordon v. United States*, 344 U.S. 414, 423, 73 S.Ct. 369, 375, 97 L.Ed. 447 (1953); *United States v. Harris*, 501 F.2d 1, 8 (9th Cir.1974).

The government relies on the ruling in *United States v. Katsougrakis*, 715 F.2d 769 (2d Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984), to support its view that the trial court was within the proper bounds of discretion in curtailing cross-examination because the defendants did not show a good faith basis for their questions. This reliance is misplaced.

■ First, even if the basis for these defendants' line of questioning were as flimsy as that in *Katsougrakis, see infra, Katsougrakis* would not be controlling here. The principal opportunity for defendants to elicit facts as to Carlos's consent occurred on the cross-examination of Carlos, *after the government had asked him on direct examination if he had any involvement in Luis's kidnaping.* "[I]f a matter has been raised on direct examination, generally cross-examination must be permitted," *United States v. Segal*, 534 F.2d 578, 582 (3d Cir.1976), and we see no basis for a deviation from this general principle in the present case. The government's own questioning, therefore, opened the door for defendants to cross-examine Carlos as to his involvement in Luis's abduction, and, without consideration of what basis there was for the defense theory, the question was proper cross-examination. The government could have, of course, simply waited for defendants to attempt to elicit during the defense case evidence as to Carlos's consent; and then, if its good-faith-basis objection were overruled, the government could have sought to rebut such evidence as was produced by reexamining Carlos and asking him whether he was involved in the taking of Luis. Having decided not to save this question for rebut-

tal, however, the prosecution could not properly forestall the defense's cross-examination on the matters brought out on direct. *See, e.g., id.* at 583 ("That specific evidence could have been a part of the defense does not preclude its development on cross-examination if the prosecution makes the subject matter part of its direct testimony."); *United States v. Lewis*, 447 F.2d 134, 139–40 (2d Cir.1971); 6 J. Wigmore, *Evidence* § 1891, at 732 (Chadbourne rev. 1976). In sum, it was patently unfair to have had the government elicit on direct examination Carlos's denial of involvement and to preclude the defendants from probing that denial.

■ Further, the government's good-faith-basis objection should not have been upheld even if the government had not opened the door with its direct examination of Carlos. In *Katsougrakis*, the trial court ruled that the defendant could not ask a witness in an arson case whether the individual who had set the allegedly arsonous fire and been killed in it had "a reputation as a hit man" without showing some good faith basis for the question. The defendant had no basis for the question other than the suspicions of his private investigator, and the trial court held this insufficient. We agreed, stating that "[a]lthough counsel may explore certain areas of inquiry in a criminal trial without full knowledge of the answer to anticipated questions, he must, when confronted with a demand for an offer of proof, provide some good faith basis for questioning that alleges adverse facts." 715 F.2d at 779.

The decision in *Katsougrakis* could not have justified the exclusionary rulings in the present case. The defendants' basis for the questions as to Carlos's consent had far more evidentiary solidity than the mere speculation of a private investigator. It included the defendants' own statements that Serrano had told them the taking of Luis was with Carlos's consent; the view of an FBI agent that Carlos was puzzlingly calm about the taking of Luis; the statement of Carlos recorded on tape that he loved his son but loved himself more; and

the evidence that on the cross-country drive Luis, the only one of the group who spoke English, had been allowed to speak for the group in restaurants, and had been taken on shopping trips with minimal supervision.

■ Moreover, these bases for the questioning had been evident even from the pretrial stage. Luis's deposition had been taken; the government had disclosed to the defendants a variety of discovery materials. Thus, when Perez moved for various relief prior to trial, the affidavit of his attorney, stating that it was based, *inter alia,* on counsel's discussions with his client, on counsel's discussions with the government, and on material provided to defendants by the government in discovery, recounted most of the above factors. The affidavit stated that "it is the defense's position that in fact LUIS ALMEDIA's [*sic*] father voluntarily gave temporary custody of LUIS to certain of the defendants as a show of his earnest of good faith that he would return the cocaine or its equivalent to apparently one 'GILBERTO' indicted under the name of RAMON ANTONIO SERRANO." At trial, both the government and the defense discussed the defense theory with the court. Although no defense attorney, until after their aborted questioning of Luis, expressly stated on the record at trial that his client told him that Serrano told them that Carlos had consented to the taking of Luis, that was the clear implication of the defense position as advanced since prior to trial. Thus, even if the government had not opened the door by asking Carlos if he had been involved in the taking of Luis, the court should not have sustained the government's objection to the defendants' questions on the ground that they had not shown a good faith basis for the questions.[5]

■ We cannot view the erroneous curtailment of cross-examination as harmless in this case. *See Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946) (error not harmless unless court can conclude with fair assurance that it did not substantially influence the jury); *United States v. Check,* 582 F.2d 668, 684 (2d Cir.1978); *United States v. Ruffin,* 575 F.2d 346, 360 (2d Cir.1978). The government, in its direct examination of Carlos, elicited his denial of any involvement in the taking of Luis. In summation, the government argued that there was no evidence of Carlos's involvement; it suggested that defendants' theory was whimsical and pointed out that it was supported only by statements attributed by the defendants to the missing Serrano. We are in no position to speculate what cross-examination would have elicited from Carlos, Lupe, and Luis on this point. Accordingly, and especially in light of the government's closing arguments and the circumstantial evidence produced by defendants as to the attitudes of Carlos and Luis, we cannot say that the prohibition on the proposed cross-examination was harmless. We thus remand for a new trial.

III. DEFENDANTS' OTHER CONTENTIONS

Defendants have made a number of other contentions on appeal, which we discuss in order to provide guidance for the parties and the court on the retrial. These include (1) the contention of Pedroza that the evidence was insufficient to convict him (an argument that, if accepted, would require the dismissal of the indictment against him, *see Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)); (2) the contentions of some or all of the defendants that the court erred in ruling admissible (a) certain hearsay statements on the basis that the declarants would later testify at trial, (b) evidence of the antecedent cocaine transaction, (c) certain statements by Osorno and Hernandez, and (d) evidence of a prior conviction of Osorno; and (3) the

---

5. To the extent that defendants sought to substantiate their contention that they had been told by Serrano that Carlos had consented, the testimony of Lupe or Luis as to Carlos's statements should not be viewed as hearsay, since those statements would not be offered for their truth but only because the simple fact that they were made makes it more probable that defendants were told the same thing.

contentions of all defendants that the court erroneously refused to give (a) a lesser-included-offense charge, and (b) an appropriate charge on knowledge and intent adverting to the defense theory of the case.[6]

A. *The Sufficiency of the Evidence as to Pedroza*

 It is well settled that a defendant who contends that the evidence was insufficient to convict him bears a very heavy burden. *United States v. Young*, 745 F.2d 733, 761 (2d Cir.1984); *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983); *United States v. Losada*, 674 F.2d 167, 173 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). In considering such a contention, the " ' "pieces of evidence must be viewed not in isolation but in conjunction," ' " *United States v. Young, supra*, at 762 (quoting *United States v. Carson, supra*, 702 F.2d at 362 (quoting *United States v. Geaney*, 417 F.2d 1116, 1121 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970))); we must view the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); and we must draw all permissible inferences in its favor, *United States v. Young, supra*, at 762; *United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 133, 134, 283, 78 L.Ed.2d 128 (1983).

 Pedroza argues that the cumulative effect of the evidence against him proves only his presence with Luis and the alleged conspirators during part of the time that they were allegedly holding Luis against his will. We agree that mere presence is insufficient to establish the knowledge and intent necessary to support a conviction for the conspiracy and kidnaping offenses with which he was charged, *see United States v. Johnson*, 513 F.2d 819 (2d

Cir.1975); *United States v. Terrell*, 474 F.2d 872, 875 (2d Cir.1973); *United States v. Cianchetti*, 315 F.2d 584, 588 (2d Cir. 1963); *United States v. Garguilo*, 310 F.2d 249, 253 (2d Cir.1962), and that there must be some evidence that the defendant had "associat[ed] himself with the venture in some fashion, 'participat[ed] in it as something that he wishe[d] to bring about,' or '[sought] by his action to make it succeed.' " *United States v. Johnson, supra*, 513 F.2d at 823 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938)); *accord Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949). *See also United States v. Gaviria*, 740 F.2d 174, 183–84 (2d Cir.1984); *United States v. Di Stefano*, 555 F.2d 1094, 1103–04 (2d Cir.1977). We conclude, however, that while the evidence against Pedroza was considerably less extensive than that against the other defendants, when all permissible inferences are drawn in favor of the government, the evidence as to Pedroza's involvement was adequate to support a finding of his guilt beyond a reasonable doubt.

The evidence was that Pedroza traveled with Pelaes to Los Angeles in November 1983; Pelaes testified that he had been hired by Serrano to help collect a debt. Pedroza, like Pelaes, was present when Hernandez and Serrano purchased the black van later used in the abduction and transportation of Luis. Although Pedroza did not, according to any of the witnesses, participate in intercepting Luis and bringing him to Fulton Street, he arrived at the Fulton Street house shortly after Luis was taken there and stayed at the house for most of the time of Luis's stay. Further, although Pedroza was not in the group that brought Luis to New York, he arrived in New York thereafter; and on the evening of December 16 when final arrangements were to be made for the exchange of Luis for the ransom, Pedroza joined Osorno, Hernandez, and Luis shortly after 8:00 p.m.

**6.** We have considered defendants' other contentions and conclude that they do not require discussion.

He remained with them for the next hour as they drove about New York, and eventually he left the car with Osorno and went to the pay telephone from which Osorno placed the final call to Carlos. He then returned to the car and brought Hernandez and Luis to the telephone.

Thus, the evidence against Pedroza was not limited to proof that he was present at certain critical stages of the conspiracy in a way that could have resulted from happenstance, as in *United States v. Johnson, supra* (defendant's presence in the automobile owned and operated by another to import narcotics could have been explained simply by defendant's desire to accompany friend on trip to Canada), or *United States v. Soto*, 716 F.2d 989 (2d Cir.1983) (defendant's residence in an apartment used as a stash pad may have been explained by fact that the defendant, recently arrived from Puerto Rico with her young child, had no other place to live). Here, Pedroza had to criss-cross the country to be present at the critical times; and there is nothing in the record to suggest that he may have had any purpose in these long trips and timely appearances other than to further the goals of the conspiracy. Thus, from the evidence that Pedroza flew to Los Angeles from Miami with Pelaes, was present during the negotiations for and later purchase of the van in which Luis was abducted, and arrived at the Fulton Street house shortly after Luis was brought there, the jury could rationally have inferred that Pedroza made the trip to Los Angeles at Serrano's behest and that, like Pelaes, Pedroza had been asked to help Serrano collect a debt. Further, from the fact that Pedroza remained in the Fulton Street house for most of the two weeks that Luis was kept there, and from the absence of any evidence that during that time Luis was ever allowed out of the house—surely unusual for a healthy 11-year-old boy—and from the facts that Luis was almost never left by himself or allowed to go near a window, the jury could have inferred that Pedroza was aware that Luis was being confined and concealed. We conclude that Pedroza's actions evidencing this awareness, together with his trip to New York and his accompaniment of Osorno, Hernandez, and Luis during what were to be the final negotiations for the exchange of Luis for the cocaine, permitted the inference that Pedroza had associated himself with the venture and sought by his actions to make it succeed.

This does not, of course, answer the question of what venture Pedroza thought he was associating himself with—whether with a kidnaping or a secured transaction. That question remains for exploration on retrial.

B. *Challenges to the Admission of Evidence*

1. *Hearsay Statements Admitted Subject to the Declarant's Testifying*

■ At the urging of the government, the trial court received in evidence several hearsay statements on the basis that the declarant would later testify at trial. These included:

(1) Lupe's testimony that on the day Luis was taken, "Carlos told me that somebody called him and said that they had our son";

(2) Lupe's testimony that several days prior to the taking of Luis, Luis had told her that he had seen Serrano and two other men in the parking lot adjacent to their home, checking out the family's cars; and

(3) FBI agent Jack Truax's testimony that when Truax took Luis to 2000 Fulton Street, Luis positively identified the house as the place he had been kept.

All of these statements were clearly hearsay for they were out-of-court statements offered in evidence to prove the truth of the matter asserted. Fed.R.Evid. 801(c). They were not properly admitted since they were not within any exception or exclusion.

■ The ground on which the statements were admitted was that the declarant would be called as a witness and be available for cross-examination at trial. Though most of the statements were in fact later reiterated by the declarants when

they testified, Carlos did not testify that the caller on the day of Luis's abduction stated that the caller had Luis, for objections to Carlos's own testimony as to what was said to him were sustained. Thus Lupe's hearsay testimony was the only evidence presented to the jury as to the substance of that early communication from the abductors. Regardless, however, of whether the declarants testified to the matters presented by the hearsay statements, the admission of the hearsay testimony was improper, for as we have stated,

> the federal courts do not recognize any exception to the hearsay rule, or, except in the limited circumstances set forth in Fed.R.Evid. 801(d), any exclusion from the definition of hearsay, which would permit testimony in court relating to the prior out-of-court statements of a witness merely because the witness is available at trial for cross-examination and subject to cross-examination concerning those statements.

*United States v. Check, supra,* 582 F.2d at 675; *accord United States v. Ziegler,* 583 F.2d 77, 81 & n. 8 (2d Cir.1978). The admission of such hearsay statements is inappropriate where, as in *Check,* the declarant does not reiterate the statements, for it provides the jury with inadmissible material that it would not otherwise have had. It is also inappropriate where, as in *Ziegler,* the declarant does so testify, since the hearsay testimony serves to bolster the testimony of the declarant.

■■■ The government argues that the hearsay statements were properly admitted as "background." There is no such exception to the hearsay rule. When statements by an out-of-court declarant are admitted as background, they are properly so admitted not as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed. *See, e.g., United States v. Lubrano,* 529 F.2d 633, 637 (2d Cir.1975), *cert. denied,* 429 U.S. 818, 97 S.Ct. 61, 50 L.Ed.2d 78 (1976); *United States v. Manfredonia,* 414 F.2d 760, 765 (2d Cir.1969).

Here there was no purpose for the hearsay testimony except for its truth. The crucial question was Carlos's understanding before the abduction of Luis, not afterwards.

Finally, the government attempts to distinguish *United States v. Ziegler, supra,* on the basis that that "case rested almost entirely on [declarant's] credibility, and the [challenged] testimony improperly bolstered that credibility," 583 F.2d at 81 n. 8, while here the credibility of the declarants was not crucial. While we have substantial doubts as to whether the bolstering of Luis's and Carlos's credibility was insignificant here, we need not decide this issue since it goes only to whether or not the error was harmless, not whether the admission of the testimony was error. Since we are reversing on other grounds, any question as to the harmlessness of the admission of the testimony is moot.

### 2. *The Antecedent Cocaine Transaction*

Defendants contend that the admission by the trial court of evidence demonstrating that Osorno had been involved in a major cocaine transaction was reversible error because the prejudice from such proof outweighed its probative value. They contend that the probative value of such proof was eliminated by their offer to stipulate that the ransom demanded for Luis's return was narcotics.

■■■ The evidence of the cocaine transaction was offered by the government, and submitted to the jury, under Fed.R.Evid. 404(b) for the limited purpose of proving defendants' motive for committing the kidnaping with which they were charged. It is normally appropriate to admit proof of motive, *see Pointer v. United States,* 151 U.S. 396, 414, 14 S.Ct. 410, 416, 38 L.Ed. 208 (1894); *United States v. Birney,* 686 F.2d 102, 106 (2d Cir.1982); *United States v. Bradwell,* 388 F.2d 619, 620–21 (2d Cir.), *cert. denied,* 393 U.S. 867, 89 S.Ct. 152, 21 L.Ed.2d 135 (1968); *United States v. Jones,* 374 F.2d 414, 419 (2d Cir. 1967) (admission at joint trial, for the pur-

pose of proving motive, of evidence of prior crime of one of co-defendants held proper), *vacated on other grounds,* 392 U.S. 299, 88 S.Ct. 2050, 20 L.Ed.2d 1104 (1968), unless its probative value is substantially outweighed by the risk of prejudice from its admission, *United States v. Birney, supra,* 686 F.2d at 106; *United States v. King,* 560 F.2d 122, 133 (2d Cir.), *cert. denied,* 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977); *see* Fed.R.Evid. 403. When the trial court has conducted such a balancing process, this Court will not overturn the decision absent a clear showing that the court abused its discretion or acted arbitrarily and irrationally. *United States v. Smith,* 727 F.2d 214, 220 (2d Cir.1984); *United States v. Jamil,* 707 F.2d 638, 642 (2d Cir.1983); *see United States v. Birney, supra,* 686 F.2d at 106.

▮ · Here there can be no question that the evidence of the cocaine transaction had potential for causing prejudice, and that the potential was greater against Pedroza, Pelaes, and Perez than against Osorno since there was no evidence that the first three were in any way involved in the antecedent transaction. *See, e.g., United States v. Figueroa,* 618 F.2d 934 (2d Cir. 1980). It is clear, however, that the trial court conducted the required balancing process. It stated:

[The prejudice is] what I have to weigh on it, and it appears to me on the face of the cursory reading that I had of the memorandum [submitted by Osorno in support of precluding evidence of the cocaine transaction], that, clearly, to enable this jury to understand what this case is about, it is going to go into the [cocaine] transaction, it preceded that kidnaping for which the kidnaping was a means of accomplishing or completing the entire drug transaction.

We cannot conclude that this determination was an abuse of the court's discretion. Although defendants' offer to stipulate might have lessened the government's need for extensive evidence of the antecedent cocaine transaction, a bare stipulation that the ransom demanded was narcotics hardly sufficed to provide an understandable backdrop for the rather unusual theories offered to explain the events. A party is normally permitted " ' "to present to the jury a picture of the events relied upon. To substitute for such a picture a naked admission might ... rob the evidence of much of its fair and legitimate weight." ' " *United States v. King,* 616 F.2d 1034, 1042 (8th Cir.1980) (quoting *Parr v. United States,* 255 F.2d 86, 88 (5th Cir.1958) (quoting *Dunning v. Maine C.R.R.,* 91 Me. 87, 97, 39 A. 352, 356 (1897)), *cert. denied,* 358 U.S. 824, 79 S.Ct. 40, 3 L.Ed.2d 64 (1958)), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 829 (1980). Thus, we would agree with the trial court that some detail as to the events involving the cocaine was necessary to the jury's understanding of, for example, whether a kidnaping was intended, why a kidnaping might have been thought desirable, and why the person abducted was Luis. Given the district court's view that the jury would be unable to understand the government's theory of the case without evidence of the cocaine transaction, its decision to admit that evidence was not improper.

▮ Nonetheless, since the evidence of the cocaine transaction did not indicate that Pedroza, Pelaes, or Perez was involved at that stage, a clearly limiting instruction would be appropriate. On retrial, if the evidentiary basis is the same and the defendants so request, the court should instruct the jury not only that the defendants are not being tried for violations of the narcotics laws, but also that there was no evidence that Pedroza, Pelaes, and Perez participated in those antecedent events.

### 3. *The Statements of Osorno*

▮ In the course of describing the cocaine transactions, Freddy testified to a number of statements made by Osorno as to Osorno's interest in the cocaine. Osorno contends that this testimony was improperly admitted under the coconspirator exclusion from the definition of hearsay, Fed.R. Evid. 801(d)(2)(E), because the statement was made in the course of and in further-

ance of a conspiracy other than the one with which he was charged in this case. We need not address the merits of such a contention since Fed.R.Evid. 801(d)(2)(A) provides that a party's own statement, if offered against him, is not hearsay. *See United States v. Matlock*, 415 U.S. 164, 172 n. 8, 94 S.Ct. 988, 993 n. 8, 39 L.Ed.2d 242 n. 8 (1974); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir.1982). The fact that the statement may have been proffered on the theory that it was a coconspirator statement admissible under a different rule is immaterial. Since it was plainly admissible against Osorno as an admission, we may sustain the court's receipt of the statement on the latter basis. *See United States v. Lieberman*, 637 F.2d 95, 103 n. 11 (2d Cir.1980).

■ On the other hand, we see no like basis for the admission of evidence as to Osorno's statements against the other defendants. As to those defendants the statements were not admissions. Nor was there any evidence that those defendants were part of the antecedent cocaine conspiracy or that they had, prior to Osorno's statements, joined any conspiracy of which Osorno was a member. Absent some other basis for admission of the Osorno statements against the other defendants, those defendants would be entitled, if they so request, to an instruction at retrial making clear that Osorno's statements are not admitted against them.

### 4. *Osorno's Prior Conviction*

Osorno contends that the district court abused its discretion in ruling *in limine* that, if Osorno testified, the government could impeach him with a 1977 conviction for conspiracy to import, possess, and distribute cocaine. Osorno claims that as a result of that ruling he decided not to testify, thereby prejudicing his defense. We find no error in the court's ruling.

Preliminarily, we note that there is some question whether a district court's *in limine* ruling is reviewable at all by an appellate court if the defendant did not testify. The circuit courts have divided, *compare United States v. Halbert*, 668 F.2d 489, 493–94 (10th Cir.), *cert. denied*, 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 453 (1982); *United States v. Kiendra*, 663 F.2d 349, 352 (1st Cir.1981); *United States v. Provenzano*, 620 F.2d 985, 1002 n. 22 (3d Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980); *United States v. Toney*, 615 F.2d 277, 279 (5th Cir.), *cert. denied*, 449 U.S. 985, 101 S.Ct. 403, 66 L.Ed.2d 248 (1980); *United States v. Cook*, 608 F.2d 1175, 1183–86 (9th Cir.1979), *cert. denied*, 444 U.S. 1034, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980) (all upholding reviewability), *with United States v. Luce*, 713 F.2d 1236, 1238–42 (6th Cir.1983) (denying reviewability), *cert. granted*, — U.S. —, 104 S.Ct. 1677, 80 L.Ed.2d 152 (1984), and the issue is currently before the Supreme Court, *United States v. Luce*, — U.S. —, 104 S.Ct. 1677, 80 L.Ed.2d 152 (1984), *granting cert. to* 713 F.2d 1236 (6th Cir. 1983). Though this Court has not expressly discussed the issue, it has been our practice not to refuse to reach the merits in such cases on the basis of the defendant's failure to testify, *see United States v. Washington*, 746 F.2d 104, 105–06 (2d Cir.1984); *United States v. Vanderbosch*, 610 F.2d 95 (2d Cir.1979); *United States v. Hayes*, 553 F.2d 824, 826–28 (2d Cir.), *cert. denied*, 434 U.S. 867, 98 S.Ct. 204, 54 L.Ed.2d 143 (1977), and we follow that practice here.

■ Fed.R.Evid. 609(a)(1) vests broad discretion in the trial judge to admit, for purposes of impeachment, evidence that the witness has been convicted within ten years of the time of his testimony of a crime punishable by imprisonment in excess of one year, but not involving dishonesty or false statements, if the court determines that "the probative value of admitting [the conviction] outweighs its prejudicial effect to the defendant." Fed.R.Evid. 609(a)(1); *see United States v. Washington, supra*, at 107; *United States v. Hawley*, 554 F.2d 50, 52–53 (2d Cir.1977); *United States v. Hayes, supra*, 553 F.2d at 828. That discretion has been characterized as "virtually unreviewable." *United*

*States v. Washington, supra,* at 107 (Newman, *J.,* concurring).

 Osorno's conviction occurred less than ten years prior to the trial in the present case and was for a crime punishable by imprisonment in excess of one year. The district court found that Osorno's conviction would be "highly probative," and we cannot say that finding is clearly wrong. Further, Osorno failed to make a record from which we could conclude that any prejudice to him outweighed the conviction's probative value. At no time did he or his counsel inform the district court that Osorno intended to testify if the conviction were excluded; nor did they inform the district court of the substance of any testimony that he might offer. Without such a showing, neither the trial court nor a reviewing court is in a position to " 'compare the relevance of the prior conviction to credibility with the importance to [the defendant's] defense of having him testify free from the prejudice which might be created by reference to it.' " *United States v. Washington, supra,* at 106 (quoting *United States v. Costa,* 425 F.2d 950, 954 (2d Cir.1969), *cert. denied,* 398 U.S. 938, 90 S.Ct. 1843, 26 L.Ed.2d 272 (1970)); *see United States v. Cook, supra,* 608 F.2d at 1186. We are thus unable to conclude that the district court abused its discretion in ruling that the probative value of Osorno's prior conviction for impeachment outweighed any prejudice from the ruling that the conviction was admissible.

If, at retrial, Osorno informs the court that he intends to testify if his conviction is to be excluded and discloses the substance of his proposed testimony, the court will be required to engage in a more detailed balancing process. Further, since Osorno's conviction would not be admissible against the other defendants, the court would have to weigh the prejudice of its admission to those defendants as well. *See United States v. Figueroa, supra,* 618 F.2d at 944–47.

### 5. *The Statement of Hernandez*

 In describing the recapture of Luis and the arrests of Pedroza, Osorno, and Hernandez, FBI agent Vernon Swint described a conversation he had with Hernandez. After the arrest, Hernandez had spoken to Luis, and Swint asked her who she was; Hernandez answered that she was Luis's mother. Defendants argue principally that, since Hernandez was already under arrest, this testimony was not properly admitted under the coconspirator exclusion from the definition of hearsay, Fed. R.Evid. 801(d)(2)(E). This argument, however, misses the mark. The testimony was not hearsay since it plainly was not offered to prove the truth of the matter asserted. Fed.R.Evid. 801(c). Rather, the statement was offered for its patent falsity.

The more pertinent question is whether the statement was relevant in the trial of these defendants. The government points out that no relevance objection was made at trial and argues that in any event Hernandez's statement was relevant to show that the defendants did not believe that Luis had been placed in their custody voluntarily. Any prior failure by the defendants to make such an objection is now, of course, moot since we have found that other grounds require a new trial, and we conclude that the merits of such an objection warrant careful consideration by the trial court if the statement is again offered. Hernandez occupied a quite different position in the events from that of these defendants. Perez, Pelaes, and Pedroza were essentially hired hands recruited from Miami by Serrano, who masterminded the affair. It does not appear that Osorno became involved in the abduction phase of the events until after Luis had been taken; Osorno initially professed not to know what was going on and offered to act as an intermediary. Hernandez, on the other hand, lived with Serrano and was perhaps his principal aide in the matter. It was she who chiefly assisted Serrano in the purchase of the van and the rental of the Fulton Street house; it was she who admonished Luis not to look out of the windows while he was being held, and she who explained to Luis that he had been taken so

that Carlos would get money for them. Though Hernandez's false exculpatory statement after her arrest bespoke her own consciousness of guilt, it is not immediately apparent to us that it is proper to impute the state of mind of Hernandez, a manager of the affair, to the hired hands. Since the question of relevance was not argued at trial, we leave the ruling on that question in the first instance to the district court, should the statement be offered again at retrial.

## C. *The Charge to the Jury*

### 1. *The Refusal To Charge a Lesser-Included Offense*

At the close of the trial, Pelaes requested that the district court submit to the jury as a lesser-included offense a charge for violation of 18 U.S.C. § 875 (1982), which prohibits the interstate transmission of any demand or request for a ransom or reward for the return of a kidnaped person. The district court properly refused this request.

■■■■ For an uncharged lesser offense to be "included," all of its elements must also be elements of the offense charged. *E.g., United States v. LoRusso*, 695 F.2d 45, 52 n. 3 (2d Cir.1982), *cert. denied*, 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983); *United States v. Giampino*, 680 F.2d 898, 901 (2d Cir.1982). As the district court correctly found, one of the elements of a violation of § 875 is the transmission in interstate commerce of a communication, and that element is contained in neither § 1201(a) nor § 1201(c) of

title 18.[7] Hence defendants were not entitled to have § 875 charged as a lesser-included offense.

■■■■ We decline defendants' invitation to fashion a new rule giving a defendant the option of having the jury charged on a lesser offense that is not included within the offense charged in the indictment. "Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion"; "a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution ...." *United States v. Batchelder*, 442 U.S. 114, 124, 125, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1979); *accord Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668, 54 L.Ed.2d 604 (1978).

### 2. *The Charge on Knowledge and Intent in Light of the Defense Theory*

■■■■ Finally, defendants contend that the district court erred in refusing to submit to the jury a charge that the defendants "ha[d] to act knowingly and intentionally in committing a kidnapping, and a defendant who believes that the boy has been voluntarily turned over by the father does not act knowingly and intentionally under the statute." The defendants do not contend that the instructions actually given by the court misstated the law. Rather, they contend that the district court erred in refusing to give an instruction that specifically enunciated their defense theory. Assuming that defendants properly made a

---

7. Section 1201(a) provides:
 (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when:
 (1) the person is willfully transported in interstate or foreign commerce;
 (2) any such act against the person is done within the special maritime and territorial jurisdiction of the United States;
 (3) any such act against the person is done within the special aircraft jurisdiction of the United States as defined in section 101(36) of the Federal Aviation Act of 1958, as amended (49 U.S.C. 1301(36)); or

(4) the person is a foreign official, an internationally protected person, or an official guest as those terms are
 defined in section 1116(b) of this title, shall be punished by imprisonment for any term of years or for life.
18 U.S.C. § 1201(a). Section 1201(c) provides:
 (c) If two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life.
18 U.S.C. § 1201(c).

request for such a charge, we agree that the jury should have been instructed along these lines.

It is well established that "[a] criminal defendant is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible that evidence may be." *United States v. O'Connor*, 237 F.2d 466, 474 n. 8 (2d Cir.1956); *see United States v. Burke*, 700 F.2d 70, 81 (2d Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *Barnes v. Jones*, 665 F.2d 427, 435 (2d Cir.1981), *rev'd on other grounds*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *United States v. Alfonso-Perez*, 535 F.2d 1362, 1365 (2d Cir.1976); *United States v. Platt*, 435 F.2d 789, 792–93 (2d Cir.1970); *see also United States v. Badalamente*, 507 F.2d 12, 22 (2d Cir.1974), *cert. denied*, 421 U.S. 911, 95 S.Ct. 1565, 43 L.Ed.2d 776 (1975); *United States v. Barash*, 412 F.2d 26, 33–34 (2d Cir.), *cert. denied*, 396 U.S. 832, 90 S.Ct. 86, 24 L.Ed.2d 82 (1969). There is no question that there was an evidentiary basis for a charge along the lines requested. *See* Part I above.

We do not view the court's instructions on knowledge, aiding and abetting, or "mere presence," etc., which were general in form, as adequate to inform the jury that if it believed the defendants' theory it was entitled to conclude that they did not have the requisite intent to be convicted of the offenses charged. As we noted in *Alfonso-Perez, supra*, "it is of some value to a defendant to have the trial judge clearly indicate to the jury what his theory of the case is, and that that theory, if believed, justifies acquittal." 535 F.2d at 1365. Therefore, if at retrial a timely request is made for a proper instruction concerning the defendants' theory that Luis had been given to them voluntarily or that they believed such to be the case, the court should include such an instruction in the charge.

### CONCLUSION

For the foregoing reasons, the judgments of conviction are vacated and the cause is remanded to the district court for a new trial.