UNITED STATES of America, Appellee,

v.

Francisco C. PELAES and Enrique Jesus Osorno, Defendants-Appellants.

Nos. 511, 617. Dockets 85–1259, 85–1262 and 85–1258L.

United States Court of Appeals, Second Circuit.

Argued Dec. 17, 1985.

Decided May 12, 1986.

Michael Kellogg, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., for S.D.N.Y., Warren Neil Eggleston, Asst. U.S. Atty., New York City, on brief), for appellee.

B. Alan Seidler, Tappan, N.Y., for defendant-appellant Francisco C. Pelaes.

Lawrence S. Kerben, New York City (Gary J. Englert, New York City, on brief), for defendant-appellant Enrique Jesus Osorno.

Before OAKES, KEARSE, and PIERCE, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Francisco C. Pelaes and Enrique Jesus Osorno appeal from judgments entered in the United States District Court for the Southern District of New York, entered after their retrial before a jury and Whitman Knapp, *Judge*, convicting them on one count of kidnaping 11-year-old Luis Almeida ("Luis") and transporting him in interstate commerce, in violation of 18 U.S.C. § 1201(a)(1) (1982), and one count of conspiring to commit those acts, in violation of 18 U.S.C. § 1201(c) (1982). Judgments of conviction entered after the first trial of these defendants and others on the same charges were set aside on appeal principally on the ground that the trial court had unduly restricted defendants' presentation of their theory of defense. *See United States v. Pedroza,* 750 F.2d 187 (2d Cir.1984) (*"Pedroza"*). The principal arguments advanced on this appeal are that the evidence was insufficient to support defendants' convictions and that the admission against Pelaes of evidence of his statement, made while he was incarcerated, to a similarly incarcerated convicted coconspirator, violated Pelaes's Sixth Amendment right to counsel. For the reasons below, we affirm the judgments of conviction.

## I. BACKGROUND

The sequence of events leading to the present prosecution, reflected by the evidence presented at both trials, was fully described in our opinion in *Pedroza.* Except to the extent necessary for discussion of defendants' specific contentions on this appeal, the evidence presented at the retrial, taken in the light most favorable to the government, will be briefly summarized here.

In November 1983, Pelaes, Angel Lastre-Parrada, and two others intercepted Luis at

gunpoint as he left his house in Los Angeles, California, and kept him at various locations in Los Angeles and New York for some three weeks. Luis was recaptured in New York by agents of the Federal Bureau of Investigation ("FBI").

The theory of the prosecution was that the kidnaping of Luis was narcotics-related. Osorno had sold ten kilograms of cocaine, on consignment, to one Ramon Antonio Serrano. On the recommendation of Luis's uncle, Jose Alfredo Almeida ("Freddy"), Serrano had entrusted most of this cocaine to Freddy's father-in-law, Victor Jimenez for safekeeping. Thereafter, the cocaine was seized by the police, and Jimenez disappeared. Serrano, who apparently did not believe Freddy's report of the seizure, attempted to find Jimenez; Osorno, who apparently had not been paid for the cocaine, attempted to find Serrano.

The government sought to prove that Pelaes and others, hired by Serrano to help recover the cocaine, had kidnaped Luis in order to coerce Freddy to disclose Jimenez's whereabouts or to cause the return of the cocaine. It presented the testimony of, *inter alios*, Luis, his parents, and Freddy, and the testimony of Lastre-Parrada, who had pleaded guilty to the kidnapping charges and agreed to cooperate with the government. Lastre-Parrada testified not only to the details of the kidnaping, including the roles played by Pelaes and Osorno, but also to the fact that Pelaes, while awaiting retrial, had asked Lastre-Parrada to testify falsely in support of Pelaes's trial contentions.

Pelaes's contention at trial was that the abductors of Luis had lacked the intent necessary to be guilty of kidnaping because they had been led by Serrano to believe that Luis's father had voluntarily given Luis to them as "security" for the return of or payment for the missing cocaine. Serrano, who also had pleaded guilty to the kidnaping charges, testified for defendants in support of this contention. Serrano testified that the purchase of the cocaine on credit had been engineered by Luis's father.

The jury found both defendants guilty on both the kidnaping and the conspiracy to kidnap counts. Pelaes was sentenced to 18 years' imprisonment on each count, to be served concurrently. Osorno was sentenced to 12 years' imprisonment on each count, to be served concurrently. These appeals followed.

## II. DISCUSSION

On appeal, Pelaes contends principally (1) that the admission of his statement, made while he was incarcerated and awaiting retrial, to Lastre-Parrada, who was incarcerated in proximity to him, violated his Sixth Amendment right to counsel, (2) that the court erred in admitting against him evidence of the cocaine transaction between Osorno and Serrano, and (3) that the evidence at trial was insufficient to convict him on the conspiracy count. Osorno contends principally that the evidence was insufficient to support his conviction on either count. We have considered these contentions, as well as defendants' other contentions, and find no basis for reversal. Only those listed above warrant discussion.

### A. *Admissibility of Pelaes's Statement to Lastre-Parrada*

■ At trial, Lastre-Parrada not only testified to his own and Pelaes's involvement in the kidnaping of Luis, but also testified that shortly before the retrial, while they both were incarcerated in the Manhattan Correctional Center ("MCC"), Pelaes had urged Lastre-Parrada not to give testimony that would incriminate Pelaes but instead to support Pelaes's contention that Luis's father had consented to the taking of Luis as security for the return of the cocaine. Relying on *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), Pelaes contends that the admission of this statement violated his Sixth Amendment right to counsel under *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964) (accused denied Sixth Amendment protections "when there was used against him at his trial evidence of his own incrimi-

nating words, which federal agents had deliberately elicited from him"). *See Wilson v. Henderson*, 742 F.2d 741, 744–45 (2d Cir.1984), *cert. granted*, — U.S. —, 105 S.Ct. 3499, 87 L.Ed.2d 630 (1985). The district court, after conducting a brief evidentiary hearing, found *Henry* inapposite because the government had neither sought to have Lastre-Parrada solicit statements from Pelaes nor sought to have Lastre-Parrada placed in proximity to Pelaes in order to gather unsolicited statements. We agree with the district court.

In *Henry*, the defendant was arrested on federal bank robbery charges and, pending trial, was confined in a city jail where one Nichols, who had been a paid government informant on a contingent fee basis for more than a year, was also incarcerated. Nichols advised an FBI agent that he was housed in the same cellblock with several federal prisoners, including Henry. The agent told Nichols not to initiate any conversation with or question Henry regarding the bank robbery, but to be alert to any statements made by Henry. After Nichols was released from jail, the agent contacted him and learned of several self-incriminating statements made by Henry, which were later used at Henry's trial. The Supreme Court ruled that this combination of circumstances was sufficient to support the view that Nichols had deliberately used his position to secure incriminating statements from Henry when Henry's counsel was not present and that that conduct was attributable to the government. The Court stated that "[e]ven if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result." *Id.* at 271, 100 S.Ct. at 2187. It concluded that

> [b]y intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel. This is not a case where, in Justice Cardozo's words, "the constable ... blundered," ...; rather, it is one where the "constable" planned an impermissible interference with the right to the assistance of counsel.

*Id.* at 274–75, 100 S.Ct. at 2189 (citation and footnotes omitted).

The finding of the trial court that there was no such intentional interference in the present case is not clearly erroneous. Lastre-Parrada testified that about one week after he had been sentenced to 15 years' imprisonment upon his plea of guilty to the kidnaping and conspiracy offenses, he had asked the wife of a fellow inmate to inform his attorney that he was willing to testify for the government. About a month later he was transferred to another prison, where he remained for several weeks, and was then brought back to MCC. It was shortly after his return to MCC that he was importuned by Pelaes to support Pelaes's version of the events. He did not hear from his attorney until after this conversation with Pelaes.

Although the record remained unclear as to whether, prior to Pelaes's statement to him, Lastre-Parrada had succeeded in communicating to his attorney or the government his willingness to cooperate, it was clear that the government brought Lastre-Parrada back to the MCC in order to explore with him the possibility of his cooperation. In so doing, however, the Assistant United States Attorney ("AUSA") in charge, Michael Kellogg, took certain steps in an attempt to avoid the possibility that Lastre-Parrada would be in proximity to his codefendants who awaited retrial. Kellogg testified that, first, he telephoned MCC and "alerted them to the fact that Mr. Lastre would be coming in and that he could not be housed in proximity to or have any contact with" the codefendants awaiting retrial. Then he wrote a letter to the person he had spoken with, reiterating these instructions. He then telephoned again to make sure that the letter had been received and that Lastre-Parrada would be housed apart from the other codefendants. He was given assurance that MCC officials understood that Lastre-Parrada should be segregated from the other codefendants.

Notwithstanding Kellogg's efforts, MCC officials placed Lastre-Parrada on the same floor on which Pelaes and another codefendant awaiting retrial were housed. Their conversation occurred on the first or second evening that Lastre-Parrada was there. Lastre-Parrada did not confer with the AUSA until the day following this conversation, which was the first that Kellogg knew that his efforts to have Lastre-Parrada segregated from the other codefendants had failed.

In the circumstances, we find no error in the district court's ruling that the government did not intentionally create a situation likely to induce Pelaes to make incriminating statements without the assistance of counsel. The AUSA did all that could reasonably have been expected of him to avoid the creation of such a situation.

In ruling that Pelaes's Sixth Amendment rights were not violated in the present case, however, we note that this is not the first incident of its kind, and we caution the government that it is the responsibility of the United States Government, not just of the United States Attorneys, to see that the rights of a defendant are not infringed. In *United States v. Cruz*, 785 F.2d 399 (2d Cir.1986), we rejected, as we have here, a defendant's claim that his Sixth Amendment rights had been violated by the elicitation of statements from him by a cooperating fellow inmate housed on the same floor of MCC as the defendant. *See also United States v. Calder*, 641 F.2d 76, 78–79 (2d Cir.), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981). In *Cruz* we upheld the district court's

> express finding that the Government did *not* deliberately seek to elicit information from Cruz by putting him on the same floor as Tuli in the MCC, however odd a coincidence it seems, especially in view of the fact that Tuli was already a government informant and Mojica turned out subsequently to be willing to cooperate with the Government.

785 F.2d at 408 (emphasis in original). Yesterday's "odd ... coincidence" was repeated here, notwithstanding the exemplary efforts of the AUSA to anticipate and avoid it. We trust that it will not be repeated again. Although the "blunder" in this case was that of the Bureau of Prisons, which operates MCC, we note that both the United States Attorneys and the Bureau of Prisons are under the aegis of the United States Attorney General, and that such lapses of coordination should be easily avoidable. If they are not avoided, the courts will be justified in viewing with considerable skepticism further "accidental" placements of cooperating informants near indicted defendants.

## B. *The Admissibility of the Antecedent Cocaine Transaction*

■ Pelaes also contends that the trial court erred in admitting in evidence against him proof of the alleged cocaine transaction that underlay the abduction of Luis. He contends that since he had no role in that transaction and no interest in the cocaine, the probative value of this evidence to show the motive for the kidnaping was outweighed by its prejudicial effect on him, and the trial court therefore could not properly admit it. We disagree.

This argument was made before us in *Pedroza* and we rejected it, noting that the evidence was relevant to defendants' motive for the abduction of Luis, and concluding that it was not an abuse of discretion for the trial court to conclude that "some detail as to the events involving the cocaine was necessary to the jury's understanding of, for example, whether a kidnapping was intended, why a kidnapping might have been thought desirable, and why the person abducted was Luis." 750 F.2d at 201. We have been given no reason to alter that view.

We also stated in *Pedroza* that since there was no indication that Pelaes or most of the other defendants had been involved in the cocaine transaction, those defendants were entitled to a clearly limiting instruction stating "not only that the defendants [were] not being tried for violations of the narcotics laws, but also that there was no evidence that [they] participated in those antecedent events." *Id.* The court at re-

trial gave the required instruction as to the limited purpose for which the jury was allowed to consider the antecedent narcotics transaction, and we find no error in the admission of this evidence.

## C.  *The Sufficiency of the Evidence*

Pelaes contends that the evidence was insufficient to support his conviction on the conspiracy count; Osorno contends that the evidence was insufficient to support his conviction on either count.  We reject these contentions.

As we stated in *Pedroza,*

> [i]t is well settled that a defendant who contends that the evidence was insufficient to convict him bears a very heavy burden. . . .  In considering such a contention, the " ' "pieces of evidence must be viewed not in isolation but in conjunction," ' " . . .; we must view the evidence in the light most favorable to the government, . . . and we must draw all permissible inferences in its favor. . . .

750 F.2d at 198 (citations omitted).  Where there are conflicts in the testimony, we must give deference to the jury's assessment of the credibility of the witnesses and to its selection between competing inferences.  *E.g., United States v. LeRoy,* 687 F.2d 610, 616 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983).  Neither defendant here carries his burden.

### 1.  *Pelaes*

As to the conspiracy charge against Pelaes, the evidence included proof that Serrano had threatened Freddy with harm to his family if the cocaine were not returned; that Pelaes, Lastre-Parrada, and others were then recruited by Serrano in Miami, Florida, to help in the recovery of the cocaine; that Pelaes flew from Miami to Los Angeles for that purpose; that ten days prior to the abduction of Luis, Serrano, Pelaes, and others purchased a van; that a few days prior to the abduction, Serrano and Lastre-Parrada reconnoitered the area around Luis's house; that, with Pelaes brandishing a gun, Luis was put into the recently purchased van and taken to a recently rented house, where Pelaes, Lastre-Parrada, and others kept Luis for some two weeks prior to taking him to New York; that numerous telephone calls were made to Luis's father demanding ransom for Luis; and that a number of the ransom-related calls were made by Pelaes.  Lastre-Parrada testified at length about these events and about Pelaes's role in them.  Most of the ransom calls, including those made by Pelaes, had been recorded, and the tapes were played for the jury.

It was the responsibility of the jury to consider all of the evidence and to determine whether the events constituted a kidnaping of Luis as the government contended, or merely a transfer of collateral as the defense contended, and whether the kidnaping was undertaken pursuant to a conspiracy.  The proof was ample to permit a rational juror to conclude beyond a reasonable doubt both that there had been a conspiracy to kidnap Luis and that Pelaes was a member of it.

### 2.  *Osorno*

Osorno's contention is that the evidence showed that he was a participant in neither the seizure of Luis nor the conspiracy to kidnap Luis.  There was no evidence that Osorno had had any contact whatever with Freddy or Luis or Luis's father prior to Luis's abduction, and Osorno took the position at trial that he had been surprised at the abduction of Luis and had merely attempted to act as an intermediary to get Luis back.  Section 1201(a) of 18 U.S.C., however, defines kidnaping to include not only abduction but "hold[ing] for ransom."  Viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the evidence was sufficient to permit the jury to infer that, in an effort to recover his cocaine, Osorno had joined the conspiracy and assumed a major role in the holding of Luis and the demand for the

return of the cocaine in exchange for Luis's release.

The evidence as to Osorno's motive was ample. The missing cocaine had belonged to Osorno, and he had not been paid for it. Soon after its absence was discovered, Osorno went to Los Angeles to attempt to find Serrano and recover the cocaine. The evidence as to his acts in the later stages of the kidnaping included proof that after Luis was brought to New York, Osorno participated in the holding of Luis and instructed Luis's father with respect to the delivery of the ransom. Thus, Osorno telephoned Luis's home, told Luis's stepmother to go to a public telephone and call him back; when she did so, Osorno told her to have Luis's father "get everything ready," and he would call back with further instructions. Two days later, Osorno telephoned Luis's father and instructed him to fly to Newark, New Jersey, and to "bring everything ... and so that you can have the child"; Osorno gave Luis's father additional instructions upon his arrival in Newark and later in New York. Osorno was with Luis when, as Osorno and others tried to make the final arrangements for the exchange of Luis for the cocaine, the FBI agents seized Luis.

Whether or not Osorno was an original participant in the kidnaping, the evidence was sufficient to permit the jury to find beyond a reasonable doubt that at the later stages of the venture he was a participant in the conspiracy and the holding for ransom. Osorno's arguments as to the credibility of the witnesses and the inferences that might be drawn in his favor are arguments more properly addressed to the jury. The jury was entitled to reject these arguments, and we find no basis for upsetting its verdict.

## CONCLUSION

We have considered all of defendants' arguments on appeal and have found them to be without merit. The judgments of conviction are affirmed.