**UNITED STATES of America,
Plaintiff,**

v.

**Varsha Mahender SABHNANI
and Mahender Murlidhar
Sabhnani, Defendants.**

No. 07–cr–429 (ADS)(WDW).

United States District Court,
E.D. New York.

March 11, 2008.

Benton J. Campbell, United States Attorney, Eastern District of New York, by Mark Joseph Lesko, Assistant United States Attorney, Demetri M. Jones, Assistant United States Attorney, Central Islip, NY, for Plaintiff.

Hoffman & Pollok LLP, New Yor, NY (Jeffrey C. Hoffman, Susan C. Wolfe, Joanna Eftychiou–Evans, of counsel), for Defendant, Varsha Mahender Sabhnani.

Scaring & Brissenden, P.L.L.C., Garden City, NY (Stephen P. Scaring, Matthew W. Brissenden, of Counsel), for Defendant, Mahender Murlidhar Sabhnani.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

Presently before the Court are motions by Varsha Mahender Sabhnani ("Varsha") and Mahender Murlidhar Sabhnani ("Mahender") (collectively, the "Defendants" or the "Sabhnanis") for judgments of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure ("Fed. R.Crim.P."). Also before the Court is a motion by Varsha for a new trial pursuant to Fed.R.Crim.P. 33. The Government opposes the motions.

### I. BACKGROUND

**A. The Indictment**

On May 22, 2007, the Defendants were indicted and charged with two counts of forced labor and two counts of harboring aliens in relation to their alleged treatment of two domestic servants from Indonesia, named Samirah and Enung. On September 18, 2007, pursuant to a superseding

indictment, the Defendants were charged with: (1) conspiracy to commit forced labor; (2) two counts of forced labor; (3) conspiracy to harbor aliens; (4) two counts of harboring aliens; (5) conspiracy to commit peonage; (6) two counts of peonage; (7) conspiracy to commit document servitude; and (8) two counts of document servitude.

## B. The Trial Testimony

On October 29, 2007, the trial commenced. Over the course of the seven week trial, the jurors heard testimony from various witnesses including law enforcement personnel and an employee of the Defendant Mahender. Most importantly, the jurors heard testimony from Samirah and Enung. Although this Court will not now review all of the testimony from this lengthy trial, the Court will discuss the testimony that is relevant to the Defendants' post-trial motions.

Samirah and Enung traveled to the United States from Indonesia to work as domestic servants in the Sabhnani home. In 2002, Mrs. Joti, Varsha's mother, escorted Samirah to the United States. The Defendants met Samirah and Mrs. Joti at the airport and escorted them to the Sabhnani home. Varsha took Samirah's passport and did not return it until April 2007, one year after its expiration. Similarly, Enung arrived in the United States in 2005, escorted by Varsha's sister and brother-in-law. Enung was also met at the airport by Varsha and Mahender. Varsha's sister gave Enung's passport and visa to Varsha. Subsequently, during an authorized search, Enung's documents were found locked in a cabinet in the Sabhnanis' bedroom closet. (Tr. 1048–49, 1283–84, 1352, 1681, 1745–49, 2070, 3036, 3047).

Mahender owns a perfume export company and his office was originally located in the Sabhnani home, but then moved to an office physically annexed to the home. Therefore, in reality, Mahender worked at home on a daily basis.

Samirah and Enung do not speak or understand English. During the trial, through interpreters, Samirah and Enung testified regarding their duties; work schedules; and the abuse they suffered. Among other abuses, they testified that they worked from four a.m. through midnight seven days a week; slept on the floor of a kitchen; had no regular days off; and had no contact with outsiders. Further, they testified that they did not have enough food and were forced to eat from the trash. (Tr. 1759, 1760–61, 1823–33, 1828, 1830–31, 1840–42, 2035, 3063–64, 3080–81, 3095). Even more serious abuse occurred to Samirah and Enung, as will now be related.

### 1. As to the Evidence of Varsha's Conduct

Samirah testified, at length, regarding the abuse she suffered at the hands of Varsha. She testified that the Defendants did not provide her with a sufficient amount of food, and that, out of hunger, she drank milk directly from a container. She further testified that Varsha beat her as punishment for drinking the milk and photographed her drinking milk from the container, threatening to send the photograph to her family to prove she was a thief. In fact, Varsha kept the photograph in a locked cabinet in the Defendants' bedroom closet. Samirah further testified that Varsha beat her upon learning that she ate food from the trash and fell asleep.

Samirah testified to even more serious acts by Varsha. Samirah described her abuse in detail, informing the jury that Varsha pulled her ears with fingernails until they bled; threw boiling water on her; cut her with a knife; hit her; pinched

her; forced her to strip her clothes off; shaved her pubic hair; wrapped her in cellophane; forced her to eat chili peppers; and forced her to eat her own vomit. In addition, Samirah testified that Varsha cut off the hair on her head; compelled her to wear eyeglasses that were fastened with a rubber band and covered with tape; and forced her to wear rags. She further testified that the rags she wore were used to clean the floor and that parts of her body were uncovered because she was not permitted to wear undergarments. In addition, when Varsha beat her, she was so frightened, she was unable to control her bladder and urinated on the floor. (Tr. 1048–54, 1064–65, 1311–12, 1761–1821, 1848–49, 1855, 1880–85, 2021).

In addition, Samirah testified that Varsha threatened to hurt her and her children if she ran away. She asked Varsha to send her back to Indonesia, but was told that in order to go back, she would have to pay the Defendants 100 million rupiahs. (Tr. 1809, 1880–85).

Enung also testified to abuse by Varsha. Enung testified that Varsha hit her on three occasions. In 2005, Varsha hit her in the face while wearing a large ring on her finger. Varsha also hit her with a metal spoon and a glass dish. In addition, Varsha threatened to have Enung's husband in Indonesia arrested if she ran away and told her that the police would shoot her if she left the Sabhnani house. (Tr. 3083–86, 3089–90, 3187–88, 3512).

Enung testified at length about Varsha's treatment of Samirah. Specifically, Enung testified that Varsha abused Samirah by pouring boiling water on her; cutting her; hitting her with various objects; forcing her to eat chili peppers; attempting to force her to drink Windex; forcing her to strip off her clothes and covering her in tape; and cutting off her hair. Strangely, Enung testified that she did not remember if she had ever personally cut Samirah. In addition, both Samirah and Enung testified that Varsha threatened to kill them. Further, Enung testified that although Varsha threw out the rags that Samirah wore, Samirah retrieved the rags from the trash and continued to wear them. (Tr. 1785–87, 1790–91, 1794–95, 3180–85, 3129–37, 3189–96, 3155–56, 3253–55, 3460–61, 3507, 3555, 3576).

As stated above, many of the facts testified to by Samirah, regarding her abuse, were corroborated by Enung. In addition, other witnesses testified regarding events that they witnessed in the Sabhnani home, further corroborating the testimony by Samirah and Enung. Most notably, Deborah Litras, the export manager for Mahender's company, who worked in the home office with Mahender, and was still in his employ at the time of the trial, further corroborated the facts alleged by Samirah and Enung. Litras testified that she secretly mailed a letter for Samirah to her children in Indonesia and deleted the return address because she did not know if the Defendants permitted Samirah and Enung to send letters home. Litras also testified that Samirah and Enung dressed in "torn or tattered type clothing." Litras bought food for Samirah and Enung, including donuts and muffins, but removed the wrappers so the Defendants would not find out. Litras testified that she felt sorry for them and "was glad" when she found out that Samirah ran away. (Tr.2050–64, 3834, 3842–48, 3853–57, 3878–79, 3881–84, 3947, 3966, 3968–69).

Litras further testified that Samirah and Enung demonstrated to her that Varsha forced Samirah to eat chili peppers and hit her. Samirah also took off her hat, showing Litras that her hair was "all cut up, chopped up." Samirah showed Litras a "big gash behind her right ear" and a bruise on her left shoulder. Litras further

testified that on another occasion, she saw Samirah with "blood coming down her face from her hairline," crouching at the door to Mahender's office. She also saw a smudge of Samirah's blood on the door. (Tr. 3858–74, 3860–71, 3885–93, 3940–44).

William Hespeler, an electrician who worked in the Sabhnani home, testified that he witnessed Samirah wearing "raggedy clothes." In addition, Anthony Pascarella, the Sabhnanis' gardener, testified that he gave food to Samirah and Enung, including donuts, chicken and bread, who were wearing "old" clothes. (Tr. 3586, 3643–48, 3653–54).

### 2. As to the Specific Evidence of Mahender's Conduct

Mahender accurately notes that both Samirah and Enung testified that he was "nice" or "good". However, that view was not precisely accurate. Samirah also testified that "[t]he mister is nice, not as mean as the missus." (Tr. at 2367). In addition, Samirah testified that when Varsha beat her, no one else was present, and Enung testified that when Samirah was beaten, Mahender was not home. Further, they testified that Mahender was not present when Samirah was forced to eat hot chili peppers or was stripped naked. In addition, they were unable to communicate with Mahender because he did not speak Indonesian. Mahender also notes that defense witnesses testified that they did not observe injuries to Samirah when they were present in the Sabhnani home. (Tr. 1776–77, 1794, 1846–48, 1870, 1883, 2052, 2370, 3131, 3241, 3402).

However, Samirah testified that although Mahender was not present during the beatings, afterwards Mahender did see her face swollen. The trial testimony further revealed that when Samirah and Enung arrived in the United States, Mahender and Varsha both met them at the airport. Further, Samirah testified that Mahender observed her eating food from the trash and on another occasion, sleeping in the bathroom. According to Samirah, Mahender reported both events to Varsha, who then "immediately hit" her. In addition, Samirah testified that Mahender scolded her and took her "to clean another person's home." Mahender also saw Samirah wearing rags. Notably, Enung testified that Varsha punished her for eating two chocolates by forcing her to stand in one place all day. During this time, Mahender laughed at her while she was standing in one place as an all day punishment. (Tr. 1791–92, 1847–49, 1855, 1869–70, 1877, 2082, 2367, 2445–47, 3494–95).

In addition, Hespeler, an electrician who worked in the home, testified that he observed Samirah wearing rags, in Mahender's presence. Also, the Sabhnanis' gardener, Pascarella, testified that he and Mahender watched as Samirah and Enung struggled to carry a large heavy bronze statue from inside the house to an area near the pool. Pascarella offered to carry the statue for them, but Mahender refused and stated that Samirah and Enung could handle the task. (Tr. 3586, 3587, 3650–53).

In addition, and significantly with regard to the Mahender convictions, the trial testimony revealed that Mahender owns a perfume company and his offices were formerly in the house and are now actually located adjacent to the home. As a result, he was at home most of the day. Mahender was home with Samirah on a daily basis for five years. He was home with Enung on a daily basis for two years. A reasonable jury could believe that he had to see, hear and know about the many abuses by his wife Varsha, and could have prevented much of the abuse. Further, based on this evidence, a reasonable jury could have found that Mahender participated in some of these cruel acts, and that

he wanted them to happen. In fact, Mahender's own employee, Litras, testified regarding her contact with Samirah and Enung during her work day. She observed them dressed in tattered rags on multiple occasions. She bought them food and treats because she felt sorry for them. In addition, she testified that while Mahender sat in his office one day, she saw Samirah crouching outside the office bleeding from her head, and later, saw a smudge of blood on the basement door. Litras testified that she waved Samirah away so Mahender would not see her. (Tr. 1791–92, 2082, 3195–99, 3834, 3842–48, 3853–57, 3878–79, 3881–93, 3947, 3966, 3968–69).

## C. The Verdict

On December 17, 2007, the jury returned a verdict finding both Defendants guilty of all 12 counts in the indictment.

On January 2, 2008, the Defendants moved for a new trial pursuant to Fed. R.Crim.P. 33. The Defendants contended that, during the trial, one of the jurors prematurely stated in the parking lot, "guilty, guilty," and as a result, the Defendants' rights to a fair trial were violated. Following a hearing, the Court denied the Defendants' motions in a written decision, *United States v. Sabhnani,* 529 F.Supp.2d 384 (E.D.N.Y.2008).

## D. The Present Motions

On January 21, 2008, Mahender moved for a judgment of acquittal. Mahender contends that the evidence at trial is insufficient to prove that he participated in forced labor, peonage or document servitude. Mahender contends that there is no evidence that he was aware of Varsha's conduct or sanctioned her conduct. He argues that he was not present during the abuse; did not spend time in close proximity to Samirah or Enung; and did not have a legal duty to stop Varsha. In addition, he contends that he did not undertake purposeful conduct in furtherance of the crimes and that his knowledge is not sufficient to justify his conviction because he did not endorse the abuse.

On January 23, 2008, Varsha moved for a judgment of acquittal arguing that the trial evidence is insufficient to justify her conviction. Specifically, Varsha contends that the testimony provided by Samirah and Enung is contradictory and that they are biased and their motives to lie were established during the trial. She further contends that the evidence adduced by the Government, including the victims' medical records, and the testimony from Litras and Pascarella, failed to substantiate the claims.

On January 23, 2008, Varsha also moved for a new trial, pursuant to Fed.R.Crim.P. 33, again arguing that the allegations made by Samirah and Enung are not supported by other evidence adduced at the trial. She contends that Samirah is mentally unstable, as exemplified by her belief in black magic. Finally, she claims that, as a result of the media attention and publicity during the trial, this Court should grant a new trial for her.

The Government opposes all the motions. The Government contends that the evidence adduced at trial is sufficient to sustain the Defendants' convictions and that no exceptional circumstances exist to justify granting a new trial.

## II. *DISCUSSION*

### A. Standards Of Review

#### 1. *The Rule 29 Standard of Review*

The standard of review on a motion for a judgment of acquittal is well-settled. In the Second Circuit it has been repeatedly stated that a defendant chal-

lenging a conviction on the basis of insufficient evidence bears a heavy burden. *United States v. Thomas,* 377 F.3d 232, 237 (2d Cir.2004); *United States v. Tocco,* 135 F.3d 116, 123 (2d Cir.1998); *United States v. Russo,* 74 F.3d 1383, 1395 (2d Cir.1996). This is because the evidence must be viewed in the light most favorable to the government and all permissible inferences must be drawn in its favor. *See United States v. Irving,* 452 F.3d 110, 117 (2d Cir.2006); *United States v. Jones,* 393 F.3d 107, 111 (2d Cir.2004); *United States v. Hernandez,* 85 F.3d 1023, 1030 (2d Cir. 1996); *see also United States v. Casamento,* 887 F.2d 1141, 1156 (2d Cir.1989). The court also must defer to the jury's resolution of witness credibility and, where there is conflicting testimony, to its selection between competing inferences. *Tocco,* 135 F.3d at 123; *see also United States v. Pelaes,* 790 F.2d 254, 259 (2d Cir.1986).

■ A conviction must be sustained if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Desimone,* 119 F.3d 217, 223 (2d Cir.1997). Further, the elements of the crimes charged may be established entirely by circumstantial evidence. *See United States v. Sureff,* 15 F.3d 225, 228 (2d Cir. 1994). Also, the court must consider the evidence in its totality, and not in isolation. *United States v. Rosenthal,* 9 F.3d 1016, 1024 (2d Cir.1993).

"If the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Autuori,* 212 F.3d 105, 114 (2d Cir.2000). With these principles in mind, the Court must uphold the jury's verdict if it finds that "any rational trier of fact could have found the essential ele-

ments of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781, 61 L.Ed.2d 560.

### 2. *The Rule 33 Standard of Review*

■ Rule 33 is very brief and states that upon the defendant's motion "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33. This rule by its terms gives the trial court "broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992); *see also United States v. Robinson,* 430 F.3d 537, 543 (2d Cir.2005). In deciding such a motion, the court may weigh the evidence and the credibility of witnesses, but cannot "wholly usurp" the role of the jury. *United States v. Autuori,* 212 F.3d 105, 120 (2d Cir.2000); *United States v. Guadagna,* 183 F.3d 122, 129 (2d Cir.1999).

■ This standard has also been described as a "heavy burden," *United States v. Fearon–Hales,* No 04–231, 2005 WL 2385845, *1, 2005 U.S. Dist. LEXIS 21619, *3 (S.D.N.Y. Sept. 26, 2005), and "[i]t is well-settled that motions for new trials are not favored and should be granted only with great caution." *United States v. Costello,* 255 F.2d 876, 879 (2d Cir.1958). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Ferguson,* 246 F.3d 129, 134 (2d Cir.2001).

### B. As To Varsha's Rule 29 Motion

#### 1. *As to the Sufficiency of the Evidence*

■ Varsha contends that the evidence is insufficient to sustain her conviction because the jury relied solely upon the testimony of Samirah and Enung. As previously discussed, Samirah and Enung

testified at length regarding the conditions of their employment and their abuse. Although Varsha attempts to point out inconsistencies in the witness' testimony, such as Enung's statement that she may, at some point, have cut Samirah, this Court must defer to the jury's resolution of witness credibility and, where there is conflicting testimony, to its selection between competing inferences. *Tocco*, 135 F.3d at 123; *Pelaes*, 790 F.2d at 259. Moreover, despite Enung's comment, the Court must consider the evidence in its totality, and not in isolation. *Rosenthal*, 9 F.3d at 1024. Enung's random comment regarding cutting Samirah does not justify a judgment of acquittal.

Similarly, although defense witnesses testified that they never saw Samirah wearing rags, Samirah, Enung, Litras and Hespeler testified that Samirah did in fact wear rags at various times. Although Enung testified that Samirah retrieved rags from the trash to wear after Varsha threw them away, that comment in isolation again does not justify overturning the jury's verdict.

Further, Varsha contends that both Samirah and Enung had motives to lie. She claims that Samirah fabricated her testimony to avenge her son's death because she believed that Varsha killed her son. She further claims that Enung fabricated her testimony as a part of a scheme to get rich. However, these theories on the part of Varsha are entirely speculative and do not justify a judgment of acquittal. These are, once again, issues of witness credibility that were appropriately assessed by the jury. The jury heard all of the testimony, including any potential bias or motives that the defense brought out on cross examination of the witnesses. As previously stated, this Court must defer to the jury's resolution of witness credibility. *Tocco*,

135 F.3d at 123; *Pelaes*, 790 F.2d at 259. Moreover, at trial, Varsha presented her theory of the witness' potential bias and motives to lie, a theory that was apparently rejected by the jury.

According to the Second Circuit, "[m]atters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and we are not entitled to second-guess the jury's assessments." *United States v. Rea*, 958 F.2d 1206, 1221–22 (2d Cir.1992). In the present case, the jury assessed the credibility of Samirah and Enung and evaluated the totality of the testimony. Its verdict is based on substantial evidence, as partially set forth above.

### 2. As to Corroboration of the Victims' Testimony

Varsha also contends that the Government failed to introduce evidence to corroborate the testimony of Samirah and Enung. Initially, the Court notes that such corroborating evidence is not required. The testimony of Samirah and Enung stands on its own, and such direct eyewitness evidence is sufficient to convict. Notwithstanding such compelling direct evidence, Varsha contends that Samirah's medical records, as well as the testimony of Litras and Pascarella, do not support the allegations of abuse. However, as discussed above, the jury weighed the evidence and the credibility of witnesses. With reasonable certainty, the jury credited the testimony of Samirah and Enung and the fact that other evidence did not corroborate their testimony does not necessarily justify granting a motion for a judgment of acquittal. As previously stated, the elements of the crimes charged may be proved entirely by circumstantial evidence. *See Sureff*, 15 F.3d at 228. However, in this case, there was direct eyewit-

ness evidence by various witnesses including the victims and Litras. In addition, various law enforcement officers who searched the house testified regarding the findings they made, including Enung's passport and visa locked in the Defendants' closet. The Court finds that the trial testimony is clearly sufficient to justify Varsha's conviction.

Varsha correctly contends that, according to Samirah's blood test results, there is no evidence that she was malnourished, and, further, that her bone scan showed no evidence of facial fracture, despite claims that she was hit in the face. However, "the government's failure to corroborate a witness's testimony raises a question as to the weight a jury might choose to give that testimony, not its legal sufficiency to support a conviction." *United States v. Florez,* 447 F.3d 145, 155 (2d Cir.2006). Moreover, "a federal conviction may be supported 'by the uncorroborated testimony' of even a single accomplice witness 'if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.'" *Id.* (citing *United States v. Parker,* 903 F.2d 91, 97 (2d Cir. 1990)). Although the medical evidence does not depict malnourishment or bone fractures, the jury reasonably believed the victims' testimony. The clear uncontradicted evidence in this trial, including photographs of the injuries to Samirah, clearly permitted the jury to conclude that Samirah was beaten and cut by Varsha, and that Samirah and Enung were not provided with sufficient amounts of food.

Moreover, although Varsha correctly notes that neither Litras nor Pascarella saw Varsha abuse Samirah or Enung, the testimony from both witnesses provided corroboration for the victims' testimony. As previously noted, Litras testified that she provided them with food and treats; consciously hid her assistance to them

from Mahender; and saw blood dripping from Samirah's head and smeared on a door. Pascarella additionally testified that he also provided the women with food. "Given the jury's prerogative to determine the credibility of the witnesses, who they evidently found believable, a reasonable view of the evidence would permit the jury to conclude that the Government met its burden of proof." *United States v. Bueno,* No. 98–cr–534, 2000 WL 246271, *3, 2000 U.S. Dist. LEXIS 2433, at *8 (N.D.N.Y. Mar. 3, 2000).

As such, Varsha's Rule 29 motion is denied.

## C. As To Varsha's Rule 33 Motion

### 1. *As to Samirah's Credibility and Corroboration of her Claims*

█ In support of her Rule 33 motion for a new trial, Varsha repeats many of the same arguments set forth in support of her Rule 29 motion and previously addressed by this Court. She again claims that Samirah's allegations of abuse are not supported by the medical evidence introduced at the trial. As this Court discussed these claims in detail in the previous section, the Court will not repeat its findings. However, as the standard on Rule 33 is different from that applicable to Rule 29 motions, the Court finds that although it may weigh the evidence and the credibility of witnesses in its present assessment, it cannot "wholly usurp" the role of the jury. *Autuori,* 212 F.3d at 120. Once again, this standard has been described as a "heavy burden," *Fearon–Hales,* 2005 WL 2385845, *1, 2005 U.S. Dist. LEXIS at *3, and "[i]t is well-settled that motions for new trials are not favored and should be granted only with great caution." *Costello,* 255 F.2d at 879.

In the present case, allowing the jury's verdict to stand with regard to Varsha

would not be a manifest injustice. Although Varsha correctly notes that there is no medical evidence of Samirah's malnourishment and that various physical examinations performed at the hospital were normal, without usurping the jury's role, the Court finds that Samirah's testimony was credible. Samirah's testimony regarding lack of food was corroborated by the testimony of both Litras and Pascarella who testified that they provided food to Samirah and Enung because they felt sorry for them. Both Litras and Pascarella believed that the women were hungry and lacked a sufficient amount of food.

Similarly, the Court finds that despite the fact that many of Samirah's medical examinations were normal, Samirah's testimony regarding her beatings and cutting was credible and corroborated. Both Samirah and Enung testified to Varsha's physical abuse. Both victims testified over the course of many days and both testified to the same actions by Varsha with regard to her mistreatment of Samirah. Further and significantly, Mahender's employee Litras testified that she saw Samirah's head bleeding and blood on the door. Also, the jury saw photographs of Samirah, taken at the hospital, depicting bruises, cuts and scrapes on her face and cuts behind her ears. In this regard, the Court notes that Samirah testified for approximately one week, and the Defendants' counsel cross-examined her at length. After hearing the totality of her testimony, as well as the corroborating testimony, and viewing the photographs, the jury clearly credited her testimony, and, on this record, they had a right to do so. Weighing the evidence and the credibility of the witnesses, the Court finds that there is no extraordinary circumstance in this case that would justify a new trial.

The Defendant further contends that Samirah's mental instability and inability to distinguish between truth and fiction are demonstrated by her belief in witchcraft and black magic. The Court disagrees. As the Defendant asserts, during her trial testimony, Samirah made statements referring to her belief in some sort of magic, including her belief that Varsha cast a spell on her son. However, the jury heard all of Samirah's testimony, including her belief in magic, and still obviously determined that her testimony was credible.

A reasonable jury could accept Samirah's testimony, even considering her beliefs. Samirah's admitted belief in magic does not necessitate a finding that she has had a "break with reality," as claimed by the Defendant. Many people of different cultures around the world believe in various forms of what can be referred to as magic, spells or curses. Samirah's belief in the casting of spells does not necessitate a finding that she lacked credibility or that her testimony should have been disregarded by the jury.

### 2. *As to the Publicity*

■ Finally, Varsha contends that this Court should grant her motion for a new trial because of the nature, extent, and pervasiveness of negative publicity during the trial. In particular, Varsha contends that she was prejudiced by the volume of media coverage, which she contends is uncommon, as well as by the sensational headlines.

"The Second Circuit made clear in *United States v. Gigante* that 'the trial court has broad discretion in determining whether prejudice has resulted from publicity during trial.'" *Johnson v. United States,* 307 F.Supp.2d 380, 388 (D.Conn.2003) (citing 729 F.2d 78, 82 (2d Cir.1984)). "The Court emphasized that each case must turn on its own facts, and the essential question is whether the jurors returned the verdict with the requisite impartiality."

*Id.* "Whether publicity is so prejudicial as to require a new trial is ordinarily committed to the trial judge's discretion. 'Generalizations beyond that statement are not profitable, because each case must turn on its special facts.'" *United States v. Brasco,* 385 F.Supp. 966, 972 (S.D.N.Y.1974) (citing *United States v. Armone,* 363 F.2d 385, 396 (2d Cir.1966)). Moreover, even in cases where a juror read a newspaper article regarding the trial, "that alone is not ground for a new trial.... The burden was upon counsel for defendant to show that prejudice resulted." *Id.*

In the present case, Varsha does not contend that any juror improperly viewed any media coverage of the trial. Instead, she merely claims that there was such an abundance of negative coverage, that the jurors would likely have been exposed to news stories. The Court finds that contention to lack merit. On each trial day, the Court instructed the jury to avoid media coverage about the trial and the case and to avoid discussing the case. On a daily basis, the Court instructed the jurors not to read a popular Long Island newspaper or watch the Long Island news channel. There is no evidence that the jurors failed to follow these daily instructions given to them for seven weeks. Varsha does not claim that any juror disregarded the Court's instructions.

In fact, when the Defendants informed the Court that an article had appeared in the New York Times regarding human trafficking during the trial, the Court immediately inquired as to whether any juror had read the article. In addition, when the defense informed the Court during the trial of an article in Newsday regarding human trafficking, which referred to the case, the Court again immediately inquired as to whether any juror had seen the article. None of the jurors had read either article. Although the case was highly publicized on Long Island and depicted in various articles, there is no evidence that Varsha was prejudiced because there is no evidence that the jury was actually exposed to any such publicity.

Moreover, as discussed in detail above, there was sufficient evidence at the trial to justify Varsha's conviction on all counts. There is no evidence that the jury's decision was based on any inappropriate or improper factors or considerations. In addition, the Court observed and stated repeatedly that the jury was alert throughout the trial and behaved in an exemplary manner.

Accordingly, Varsha's Rule 33 motion is denied.

### D. As To Mahender's Rule 29 Motion

Mahender contends that he was not aware of Varsha's conduct and more importantly, that he did not act with the requisite specific intent to commit forced labor, peonage or document servitude.

#### 1. *As to Aiding and Abetting and Conspiracy to Commit Forced Labor, Peonage and Document Servitude*

■■■ As Mahender correctly notes, aiding and abetting and conspiracy are specific intent crimes. In order to prove conspiracy

the government must show that the defendant agreed with another to commit the offense; that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy; and that an overt act in furtherance of the conspiracy was committed ... A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct.

*United States v. Samaria,* 239 F.3d 228, 234 (2d Cir.2001) (internal citations omitted). "[T]he government [must] establish beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute." *Id.* However,

> [t]he government may prove knowledge and specific intent either by direct evidence, or ... with circumstantial evidence. This Court has repeatedly emphasized, however, that a defendant's mere presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in the conspiracy, even if the defendant has knowledge of the conspiracy.

*Samaria,* 239 F.3d at 235.

▆▆▆▆ "[A]iding and abetting is also a specific intent crime. To convict a defendant on a theory of aiding and abetting, the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted ... with the specific purpose of bringing about the underlying crime." *Samaria,* 239 F.3d at 234–35 (internal citations omitted). "Much like a conspiracy charge, in order to prove that a defendant aided and abetted a substantive crime, the government must prove that the defendant 'joined and shared in the underlying criminal endeavor and that his efforts contributed to its success' ". *United States v. Smith,* 198 F.3d 377, 383 (2d Cir.1999)

Further, forced labor, peonage and document servitude are also specific intent crimes. As the jury was instructed at the trial, a conviction of forced labor under 18 U.S.C. 1589 required the government to prove beyond a reasonable doubt that (1) the defendant obtained the labor or services of another person; (2) the defendant did so through one of the following prohibited means (a) through threats of serious harm to, or physical restraint against that

person or any other person; or (b) through a scheme, plan or pattern intended to cause the person to believe that non-performance would result in serious harm to, or physical restraint against, that person or any other person; or (c) through the abuse or threatened abuse of the law or the legal process; and (3) that the defendant acted knowingly. (Tr. 5024–25). *See also United States v. Marcus,* 487 F.Supp.2d 289, 310 (E.D.N.Y.2007).

As the jury was instructed at the trial, a conviction for peonage required the Government to prove beyond a reasonable doubt (1) that the Defendant held Samirah and Enung in a condition of involuntary servitude;(2) that the Defendant held Samirah and Enung by using force, physical violence, intimidation or other compulsion; (3) that such holding was for a "term"; (4) that the Defendant acted knowingly and willfully with specific intent to violate the law; and (5) that the Defendant kept the person to satisfy a real or imagined debt, regardless of amount. (Tr. 5094).

As the jury was instructed at the trial, a conviction for document servitude required the Government to prove, beyond a reasonable doubt that the Defendant (1) did conceal, remove, confiscate, or possess an actual passport, visa, or other immigration documents of Samirah and Enung; (2) that the Defendant did these acts in the course of a violation of 18 U.S.C Section 1581, the peonage statute, or 1589 the forced labor statute, with the intent to violate those statutes; and (3) that the Defendant acted knowingly and intentionally. (Tr. 5115).

### 2. *As to the Evidence of Mahender's Knowledge and Specific Intent*

The jury determined that Mahender was guilty of the substantive crimes of forced labor, peonage and document servitude, as well as conspiracy to commit those crimes. The Court must uphold the jury's verdict if

it finds that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781, 61 L.Ed.2d 560.

Mahender contends that his conviction should be set aside because: (1) the evidence was insufficient to prove that he had knowledge of his wife's abuse of Samirah and Enung; (2) the evidence was insufficient to show that he acted wilfully and with the specific intent to commit forced labor and peonage; and (3) the evidence was insufficient to support his conviction under a failure to act rationale. Again, the Court disagrees. The Court finds that the trial evidence was sufficient to demonstrate that Mahender conspired with and aided and abetted Varsha to commit forced labor, peonage and document servitude. In this regard, the Court finds that the Government established that Mahender had the specific intent to violate the substantive statutes. The trial evidence established that Mahender's efforts contributed to the success of the criminal endeavors. *Smith*, 198 F.3d at 383.

Although Mahender, in a well drawn brief, cites numerous cases in which Courts have held that the evidence was insufficient to sustain convictions for conspiracy and aiding and abetting, in those cases the defendants did not participate or associate themselves with the criminal venture. For example, in many of the cases cited by Mahender, the defendant was merely present in a house, for a short period of time, while a crime was being committed and had knowledge of the crime. In one of the cases cited by Mahender, the defendant was present in a car carrying drugs, and in another case, the defendant was living in an apartment for one month that was actually serving as a narcotics cutting mill. Although the courts found that joint occupancy, knowledge and even obtaining a benefit from the crimes, without participation, were not sufficient to establish the requisite specific intent, Mahender's presence in the house with Samirah for five years and his participation results in a much different scenario.

In this case, the trial evidence demonstrates that Mahender was not just an occupant of the Sabhnani house who did not understand and participate in his wife's conduct. Rather, it is evident that Mahender acted purposefully to associate himself with the crimes and with the specific intent to commit or aid and abet in the crimes charged.

■ First, regarding the specific intent to commit forced labor, the trial evidence previously discussed demonstrates that Mahender had the intent to obtain the services of Samirah and Enung through Varsha's conduct which threatened both Samirah and Enung. Mahender reported to Varsha that Samirah was sleeping, and as a result, Varsha beat her. Mahender permitted Samirah and Enung to carry a heavy statue and refused any offer to assist them. Mahender allowed Samirah to follow him around with a tray of beverages, despite her "raggedy" clothing and swollen face. In fact, as to the "rags," Samirah testified, as follows:

Q. During the five years that you worked there, did the mister see you wearing the rags?

Mr. Scaring: Objection, your Honor. Leading questions.

The Court: Overruled.

A. Yes, every day.

Q. How many times a day did you see the mister when you worked at the house between 2005 and 2007?

A. Every day because the mister would go to the front room, every day.

Q. Could the mister see your face?

Mr. Scaring: Objection.

The Court: Pardon?

Mr. Scaring: Objection. She cannot testify as to what the mister saw, your Honor.

The Court: Overruled. She can have an opinion as a layperson.

A. Yes. Every day, he would see because he will see.

Q. Would see what?

A. To see my face, to see the clothings, also, all the marks from the beatings from missus. I would cry and the mister would look at me. He would look at me this way, and then mister wouldn't say anything or do anything.

(Tr. at 2367–68). Mahender even laughed at Enung as she stood in one place all day, fulfilling her punishment for eating two chocolates. Moreover, as Litras testified, Samirah was bleeding from her head outside Mahender's office in the residence.

Although there is no evidence that Mahender physically abused Samirah and Enung, the trial evidence is sufficient to show that he had, not only knowledge of Varsha's actions, but the specific intent to violate the forced labor statute. Mahender's actions demonstrate that he "joined and shared in the underlying criminal endeavor and that his efforts contributed to its success." *Smith,* 198 F.3d at 383. As to Samirah, for five years he permitted these acts to occur and joined in some of them. He participated in the same conduct with Enung for two years.

 Second, with regard to the specific intent to commit peonage, Mahender was aware that Samirah and Enung were being held at the Sabhnani house to work against their will. He also had the specific intent to hold them for many years in a condition of involuntary servitude by way of Varsha's threats and coercion. Mahender himself took Samirah and Enung to clean another person's house without paying them. He reported them to Varsha so that she could administer their punishment when they failed to perform their expected duties, and even laughed as he witnessed Enung's punishment. They slept on the floor in his house for years and he watched as they worked with only four hours of sleep each night. Once again, although he did not personally physically abuse them or personally verbally threaten them, the trial evidence shows his specific intent to hold them in a condition of involuntary servitude by means of Varsha's threats and actions. This does not evidence mere knowledge by Mahender or his mere joint occupancy of the house; rather, it evidences his knowing participation in the criminal endeavors.

Similarly, the evidence also demonstrates his specific intent to commit document servitude. The victims' relevant documents were found in a locked cabinet in the closet he shared with Varsha. Mahender met the women at the airport and knew that they had arrived from Indonesia. On the evidence adduced at the trial, the jury could reasonably conclude that he participated in the concealment of the women's immigration documents. In addition, as previously discussed, there was evidence over this long period of time that he had the specific intent to commit forced labor and peonage.

Mahender further contends that the Court erred in instructing the jury that aiding and abetting can be accomplished by action or by a defendant's failure to act. Mahender claims that there is no evidence that he had a duty to act and failed to do so. He contends that Samirah and Enung never complained to him or asked him for medical assistance, and, as a result, no duty arose.

 "In order to prove a defendant guilty of aiding and abetting, 'the government must ... prove ... that the defendant himself either acted or failed to act with the specific intent of advancing the commission of the underlying crime.'" *Smith*, 198 F.3d at 388 (citing *United States v. Pipola*, 83 F.3d 556, 562 (2d Cir.1996)). *See also United States v. Labat*, 905 F.2d 18, 23 (2d Cir.1990) ("To convict a defendant on a theory of aiding and abetting, the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted, or failed to act in a way that the law required him to act, with the specific purpose of bringing about the underlying crime").

In any event, despite Mahender's claim that he could not be guilty as an aider and abettor for failing to act because he had no duty to act, the Court finds that there was sufficient evidence at the trial to prove that Mahender affirmatively acted with the specific intent to advance the crimes alleged in the indictment. The Government proved that Mahender acted "with the specific purpose of bringing about the underlying crime[s]." *Samaria*, 239 F.3d at 234–235. The proof was clear that Mahender had the knowledge and specific intent. As stated above, although Mahender did not physically beat Samirah and Enung, his actions go well beyond mere knowledge and joint occupancy of the house. As discussed, for years Mahender permitted and, to some extent, participated in these deplorable conditions as to Samirah and Enung. His actions with regard to Samirah and Enung aided the underlying criminal endeavors. As a result, this is not only a failure to act case; rather, this is a case where the Defendant took affirmative action in support of the crimes charged in the indictment.

Accordingly, Mahender's Rule 29 motion is denied.

## III. *CONCLUSION*

Based on the foregoing, it is hereby

**ORDERED,** that the Defendant Varsha Sabhnani's Rule 29 motion for a judgment of acquittal is **DENIED;** and it is further

**ORDERED,** that the Defendant Varsha Sabhnani's Rule 33 motion for a new trial is **DENIED;** and it is further

**ORDERED,** that the Defendant Mahender Sabhnani's Rule 29 motion for a judgment of acquittal is **DENIED.**

**SO ORDERED.**